*5 Justice Kennedy
delivered the opinion of the Court.
This ease presents, as it has from its inception in the United States District Court, a question of interpretation under the Hague Convention on the Civil Aspects of International Child Abduction (Convention), Oct. 25,1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99-11. The United States is a contracting state to the Convention; and Congress has implemented its provisions through the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 42 U. S. C. §11601 et seq. The Convention provides that a child abducted in violation of “rights of custody” must be returned to the child’s country of habitual residence, unless certain exceptions apply. Art. 1, S. Treaty Doc. No. 99-11, at 7 (Treaty Doc.). The question is whether a parent has a “righ[t] of custody” by reason of that parent’s ne exeat right: the authority to consent before the other parent may take the child to another country.
I
Timothy Abbott and Jacquelyn Vaye Abbott married in England in 1992. He is a British citizen, and she is a citizen of the United States. Mr. Abbott’s astronomy profession took the couple to Hawaii, where their son A. J. A. was born in 1995. The Abbotts moved to La Serena, Chile, in 2002. *6 There was marital discord, and the parents separated in March 2003. The Chilean courts granted the mother daily care and control of the child, while awarding the father “direct and regular” visitation rights, including visitation every other weekend and for the whole month of February each year. App. 9.
Chilean law conferred upon Mr. Abbott what is commonly known as a we exeat right: a right to consent before Ms. Abbott could take A. J. A. out of Chile. See Minors Law 16,618, Art. 49, App. to Pet. for Cert. 61a (granting a ne exeat right to any parent with visitation rights). In effect a ne exeat right imposes a duty on one parent that is a right in the other. After Mr. Abbott obtained a British passport for A. J. A., Ms. Abbott grew concerned that Mr. Abbott would take the boy to Britain. She sought and obtained a “ne exeat of the minor” order from the Chilean family court, prohibiting the boy from being taken out of Chile. App. to Pet. for Cert. 68a-69a.
In August 2005, while proceedings before the Chilean court were pending, the mother removed the boy from Chile without permission from either the father or the court. A private investigator located the mother and the child in Texas. In February 2006, the mother filed for divorce in Texas state court. Part of the relief she sought was a modification of the father’s rights, including full power in her to determine the boy’s place of residence and an order limiting the father to supervised visitation in Texas. This litigation remains pending.
Mr. Abbott brought an action in Texas state court, asking for visitation rights and an order requiring Ms. Abbott to show cause why the court should not allow Mr. Abbott to return to Chile with A. J. A. In February 2006, the court denied Mr. Abbott’s requested relief but granted him “liberal periods of possession” of A. J. A. throughout February 2006, provided Mr. Abbott remained in Texas. App. 42.
*7 Iii May 2006, Mr. Abbott filed the instant action in the United States District Court for the Western District of Texas. He sought an order requiring his son’s return to Chile pursuant to the Convention and enforcement provisions of the ICARA. In July 2007, after holding a bench trial during which only Mr. Abbott testified, the District Court denied relief. The court held that the father’s ne exeat right did not constitute a right of custody under the Convention and, as a result, that the return remedy was not authorized. 495 F. Supp. 2d 635, 640.
The United States Court of Appeals for the Fifth Circuit affirmed on the same rationale. The court held the father possessed no rights of custody under the Convention because his ne exeat right was only “a veto right over his son’s departure from Chile.” 542 F. 3d 1081, 1087 (2008). The court expressed substantial agreement with the Court of Appeals for the Second Circuit in Croll v. Croll, 229 F. 3d 133 (2000). Relying on American dictionary definitions of “custody” and noting that ne exeat rights cannot be “ 'actually exercised’ ” within the meaning of the Convention, Croll held that ne exeat rights are not rights of custody. Id., at 138-141 (quoting Art. 3(6)). A dissenting opinion in Croll was filed by then-Judge Sotomayor. The dissent maintained that a ne exeat right is a right of custody because it “provides a parent with decisionmaking authority regarding a child’s international relocation.” Id., at 146.
The Courts of Appeals for the Fourth and Ninth Circuits adopted the conclusion of the Croll majority. See Fawcett v. McRoberts, 326 F. 3d 491, 500 (CA4 2003); Gonzalez v. Gutierrez, 311 F. 3d 942, 949 (CA9 2002). The Court of Appeals for the Eleventh Circuit has followed the reasoning of the Croll dissent. Furnes v. Reeves, 362 F. 3d 702, 720, n. 15 (2004). Certiorari was granted to resolve the conflict. 557 U. S. 933 (2009).
*8 II
The Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes. The Convention seeks “to secure the prompt return of children wrongfully removed to or retained in any Contracting State,” and “to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.” Art. 1, Treaty Doc., at 7.
The provisions of the Convention of most relevance at the outset of this discussion are as follows:
“Article 3: The removal or the retention of the child is to be considered wrongful where—
“a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
“b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
“Article 5: For the purposes of this Convention—
“a ‘rights of custody[5] shall include rights relating to the care of the person of the child and, in particular, the right to determine the child’s place of residence;
“b ‘rights of access’ shall include the right to take a child for a limited period of time to a place other than the child’s habitual residence.
“Article 12: Where a child has been wrongfully removed or retained in terms of Article 3 ... the authority concerned shall order the return of the child forthwith.” Id., at 7, 9.
*9 The Convention’s central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must “order the return of the ehild forthwith,” unless certain exceptions apply. See, e. g., Arts. 4,12, ibid. A removal is “wrongful” where the child was removed in violation of “rights of custody.” The Convention defines “rights of custody” to “include rights relating to the care of the person of the ehild and, in particular, the right to determine the child’s place of residence.” Art. 5(a), id., at 7. A return remedy does not alter the preabduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence. Art. 19, id., at 11. The Convention also recognizes “rights of access,” but offers no return remedy for a breach of those rights. Arts. 5(b), 21, id., at 7,11.
The United States has implemented the Convention through the ICARA. The statute authorizes a person who seeks a child’s return to file a petition in state or federal court and instructs that the court “shall decide the case in accordance with the Convention.” 42 U. S. C. §§ 11603(a), (b), (d). If the child in question has been “wrongfully removed or retained within the meaning of the Convention,” the ehild shall be “promptly returned,” unless an exception is applicable. § 11601(a)(4).
Ill
As the parties agree, the Convention applies to this dispute. A. J. A. is under 16 years old; he was a habitual resident of Chile; and both Chile and the United States are contracting states. The question is whether A. J. A. was “wrongfully removed” from Chile, in other words, whether he was removed in violation of a right of custody. This Court’s inquiry is shaped by the text of the Convention; the views of the United States Department of State; decisions addressing the meaning of “rights of custody” in courts of *10 other contracting states; and the purposes of the Convention. After considering these sources, the Court determines that Mr. Abbott’s ne exeat right is a right of custody under the Convention.
A
“The interpretation of a treaty, like the interpretation of a statute, begins with its text.” Medellín v. Texas, 552 U. S. 491, 506 (2008). This Court consults Chilean law to determine the content of Mr. Abbott’s right, while following the Convention’s text and structure to decide whether the right at issue is a “righ[t] of custody.”
Chilean law granted Mr. Abbott a joint right to decide his child’s country of residence, otherwise known as a we exeat right. Minors Law 16,618, Art. 49, App. to Pet. for Cert. 61a, 62a, provides that “[o]nce the court has decreed” that one of the parents has visitation rights, that parent’s “authorization .. . shall also be required” before the child may be taken out of the country, subject to court override only where authorization “cannot be granted or is denied without good reason.” Mr. Abbott has “direct and regular” visitation rights, and it follows from Chilean law that he has a shared right to determine his son’s country of residence under this provision. App. 9. To support the conclusion that Mr. Abbott’s right under Chilean law gives him a joint right to decide his son’s country of residence, it is notable that a Chilean agency has explained that Minors Law 16,618 is a “‘right to authorize the minors’ exit’” from Chile and that this provision means that neither parent can “unilaterally” “establish the [child’s] place of residence.” Letter from Paula Strap Camus, Director General, Corporation of Judicial Assistance of the Region Metropolitana, to National Center for Missing and Exploited Children (Jan. 17, 2006), App. to Pet. for Cert, in Villegas Duran v. Arribada Beaumont, No. 08-775, pp. 35a-37a, cert. pending [Reporter’s Note: See post, p. 921].
*11 The Convention recognizes that custody rights can be decreed jointly or alone, see Art. 3(a), Treaty Doc., at 7; and Mr, Abbott’s joint right to determine his son’s country of residence is best classified as a joint right of custody, as the Convention defines that term. The Convention defines “rights of custody” to “include rights relating to the care of the person of the child and, in particular, the right to determine the child’s place of residence.” Art. 5(a), ibid. Mr. Abbott’s ne exeat right gives him both the joint “right to determine the child’s place of residence” and joint “rights relating to the care of the person of the child.”
Mr. Abbott’s joint right to decide A. J. A.’s country of residence allows him to “determine the child’s place of residence.” The phrase “place of residence” encompasses the child’s country of residence, especially in light of the Convention’s explicit purpose to prevent wrongful removal across international borders. See Convention Preamble, Treaty Doc., at 7. And even if “place of residence” refers only to the child’s street address within a country, a ne exeat right still entitles Mr. Abbott to “determine” that place. “[Dieter-mine” can mean “[t]o fix conclusively or authoritatively,” Webster’s New International Dictionary 711 (2d ed. 1954) (2d definition), but it can also mean “[t]o set bounds or limits to,” ibid. (1st definition), which is what Mr. Abbott’s ne exeat right allows by ensuring that A. J. A. cannot live at any street addresses outside of Chile. It follows that the Convention’s protection of a parent’s custodial “right to determine the child’s place of residence” includes a ne exeat right.
Mr. Abbott’s joint right to determine A. J. A.’s country of residence also gives him “rights relating to the care of the person of the child.” Art. 5(a), Treaty Doe., at 7. Pew decisions are as significant as the language the child speaks, the identity he finds, or the culture and traditions she will come to absorb. These factors, so essential to self-definition, are linked in an inextricable way to the child’s country of residence. One need only consider the different childhoods *12 an adolescent will experience if he or she grows up in the United States, Chile, Germany, or North Korea, to understand how choosing a child’s country of residence is a right “relating to the care of the person of the child.” The Court of Appeals described Mr. Abbott’s right to take part in making this decision as a mere “veto,” 542 F. 3d, at 1087; but even by that truncated description, the father has an essential role in deciding the boy’s country of residence. For example, Mr. Abbott could condition his consent to a change in country on A. J. A.’s moving to a city outside Chile where Mr. Abbott could obtain an astronomy position, thus allowing the father to have continued contact with the boy.
That a ne exeat right does not fit within traditional notions of physical custody is beside the point. The Convention defines “rights of custody,” and it is that definition that a court must consult. This uniform, text-based approach ensures international consistency in interpreting the Convention. It forecloses courts from relying on definitions of custody confined by local law usage, definitions that may undermine recognition of custodial arrangements in other countries or in different legal traditions, including the civil-law tradition. And, in any case, our own legal system has adopted conceptions of custody that accord with the Convention’s broad definition. Joint legal custody, in which one parent cares for the child while the other has joint decisionmaking authority concerning the child’s welfare, has become increasingly common. See Singer, Dispute Resolution and the Postdivorce Family: Implications of a Paradigm Shift, 47 Family Ct. Rev. 363, 366 (2009) (“[A] recent study of child custody outcomes in North Carolina indicated that almost 70% of all custody resolutions included joint legal custody, as did over 90% of all mediated custody agreements”); E. Maccoby & R. Mnookin, Dividing the Child: Social and Legal Dilemmas of Custody 107 (1992) (“[F]or 79 percent of our entire sample, the [California] divorce decree provided for joint legal custody”); see generally Elrod, Reforming the System To Protect Children *13 in High Conflict Custody Cases, 28 Wm. Mitchell L. Rev. 495, 505-508 (2001).
Ms. Abbott gets the analysis backwards in claiming that a ne exeat right is not a right of custody because the Convention requires that any right of custody must be capable of exercise. The Convention protects rights of custody when “at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.” Art. 3(6), Treaty Doc., at 7. In cases like this one, a ne exeat right is by its nature inchoate and so has no operative force except when the other parent seeks to remove the child from the country. If that occurs, the parent can exercise the ne exeat right by declining consent to the exit or placing conditions to ensure the move will be in the child’s best interests. When one parent removes the child without seeking the Tie exeat holder’s consent, it is an instance where the right would have been “exercised but for the removal or retention.” Ibid.
The Court of Appeals’ conclusion that a breach of a ne exeat right does not give rise to a return remedy would render the Convention meaningless in many cases where it is most needed. The Convention provides a return remedy when a parent takes a child across international borders in violation of a right of custody. The Convention provides no return remedy when a parent removes a child in violation of a right of access but requires contracting states “to promote the peaceful enjoyment of access rights.” Art. 21, id., at 11. For example, a court may force the custodial parent to pay the travel costs of visitation, see, e. g., Viragh v. Foldes, 415 Mass. 96, 109-111, 612 N. E. 2d 241, 249-250 (1993), or make other provisions for the noncustodial parent to visit his or her child, see § 11603(b) (authorizing petitions to “secur[e] the effective exercise of rights of access to a child”). But unlike rights of access, ne exeat rights can only be honored *14 with a return remedy because these rights depend on the child’s location being the country of habitual residence.
Any suggestion that a ne exeat right is a “righft] of access” is illogical and atextual. The Convention defines “rights of access” as “including] the right to take a child for a limited period of time to a place other than the child’s habitual residence,” Art. 5(b), Treaty Doc., at 7, and the ICARA defines that same term as “visitation rights,” § 11602(7). The joint right to decide a child’s country of residence is not even arguably a “right to take a child for a limited period of time” or a “visitation righ[t].” Reaching the commonsense conclusion that a ne exeat right does not fit these definitions of “rights of access” honors the Convention’s distinction between rights of access and rights of custody.
Ms. Abbott argues that the ne exeat order in this case cannot create a right of custody because it merely protects a court’s jurisdiction over the child. Even if this argument were correct, it would not be dispositive. Ms. Abbott contends the Chilean court’s ne exeat order contains no parental consent provision and so awards the father no rights, custodial or otherwise. See Brief for Respondent 22; but see 495 F. Supp. 2d, at 638, n. 3 (the District Court treating the order as containing a consent provision); 542 F. 3d, at 1084 (same for the Court of Appeals). Even a ne exeat order issued to protect a court’s jurisdiction pending issuance of further decrees is consistent with allowing a parent to object to the child’s removal from the country. This Court need not decide the status of ne exeat orders lacking parental consent provisions, however; for here the father relies on his rights under Minors Law 16,618. Mr. Abbott’s rights derive not from the order but from Minors Law 16,618. That law requires the father’s consent before the mother can remove the boy from Chile, subject only to the equitable power family courts retain to override any joint custodial arrangements in times of disagreement. Minors Law 16,618; see 1 J. Atkinson, Modern Child Custody Practice §6-11, p. 6-21 (2d ed. *15 2009) (“[TJhe court remains the final arbiter and may resolve the [dispute between joint custodians] itself or designate one parent as having final authority on certain issues affecting thé child”); Lombardo v. Lombardo, 202 Mich. App. 151, 159, 507 N. W. 2d 788, 792 (1993) (“[WJhere the parents as joint custodians cannot agree on important matters such as education, it is the court’s duty to determine the issue in the best interests of the child”). The consent provision in Minors Law 16,618 confers upon the father the joint right to determine his child’s country of residence. This is a right of custody under the Convention.
B
This Court’s conclusion that Mr. Abbott possesses a right of custody under the Convention is supported and informed by the State Department’s view on the issue. The United States has endorsed the view that ne exeat rights are rights of custody. In its brief before this Court the United States advises that “the Department of State, whose Office of Children’s Issues serves as the Central Authority for the United States under the Convention, has long understood the Convention as including ne exeat rights among the protected 'rights of custody.’ ” Brief for United States as Amicus Curiae 21; see Sumitomo Shoji America, Inc. v. Avagliano, 457 U. S. 176, 184, n. 10 (1982) (deferring to the Executive’s interpretation of a treaty as memorialized in a brief before this Court). It is well settled that the Executive Branch’s interpretation of a treaty “is entitled to great weight.” Id., at 185. There is no reason to doubt that this well-established canon of deference is appropriate here. The Executive is well informed concerning the diplomatic consequences resulting from this Court’s interpretation of “rights of custody,” including the likely reaction of other contracting states and the impact on the State Department’s ability to reclaim children abducted from this country.
*16 c
This Court’s conclusion that ne exeat rights are rights of custody is further informed by the views of other contracting states. In interpreting any treaty, “[t]he ‘opinions of our sister signatories’ ... are ‘entitled to considerable weight.’” El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U. S. 155, 176 (1999) (quoting Air France v. Saks, 470 U. S. 392, 404 (1985)). The principle applies with special force here, for Congress has directed that “uniform international interpretation of the Convention” is part of the Convention’s framework. See § 11601(b)(3)(B).
A review of the international case law confirms broad acceptance of the rule that ne exeat rights are rights of custody. In an early decision, the English Court of Appeal explained that a father’s “right to ensure that the child remained] in Australia or live[d] anywhere outside Australia only with his approval” is a right of custody requiring return of the child to Australia. C. v. C., [1989] 1 W. L. R. 654, 658 (C. A.). Lords of the House of Lords have agreed, noting that C. v. C.’s conclusion is “settled, so far as the United Kingdom is concerned” and “appears to be the majority [view] of the common law world.” See In re D (A Child), [2007] 1 A. C. 619, ¶¶ 14, 31, 37 (2006).
The Supreme Court of Israel follows the same rule, concluding that “the term ‘custody’ should be interpreted in an expansive way, so that it will apply [i]n every case in which there is a need for the consent of one of the parents to remove the children from one country to another.” CA 5271/ 92 Foxman v. Foxman, [1992], §§ 3(D), 4 (K. Chagall transl.). The High Courts of Austria, South Africa, and Germany are in accord. See Oberster Gerichtshof [OGH] [Supreme Court] Feb. 5, 1992, 2 Ob 596/91 (Austria) (Dept. of State transl.) (“Since the English Custody Court had ordered that the children must not be removed from England and Wales without the father’s written consent, both parents had, in effect, been granted joint custody concerning the children’s *17 place of residence”); Sonderup v. Tondelli, 2001 (1) SA 1171, 1183 (Constitutional Ct., S. Afr. 2000) (“[The mother’s] failure to return to British Columbia with the child... was a breach of the conditions upon which she was entitled to exercise her rights of custody and . . . therefore constituted a wrongful retention ... as contemplated by [Article 3] of the Convention”); Bundesverfassungsgericht [BVerfG] [Fed. Constitutional Ct.] July 18, 1997, 2 BvR 1126/97, ¶ 15 (Ger.) (Dept. of State transl.) (the Convention requires a return remedy for a violation of the “right to have a say in the child’s place of residence”). Appellate courts in Australia and Scotland agree. See In the Marriage of Resina, [1991], FamCA 33, ¶¶ 18-27 (Austl.); A. J. v. F. J., [2005] CSIH 36, 2005 1 S. C. 428, 435-436.
It is true that some courts have stated a contrary view, or at least a more restrictive one. The Canadian Supreme Court has said ne exeat orders are “usually intended” to protect access rights. Thomson v. Thomson, [1994] 3 S. C. R. 551, 589-590, 119 D. L. R. (4th) 253, 281; see D. S. v. V. W., [1996] 2 S. C. R. 108, 134 D. L. R. (4th) 481. But the Canadian eases are not precisely on point here. Thomson ordered a return remedy based on an interim ne exeat order, and only noted in dicta that it may not order such a remedy pursuant to a permanent ne exeat order. See [1994] 3 S. C. R., at 589-590, 119 D. L. R. (4th), at 281. D. S. involved a parent’s claim based on an implicit ne exeat right and, in any event, the court ordered a return remedy on a different basis. See [1996] 2 S. C. R., at 140-141, 142, 134 D. L. R. (4th), at 503-504, 505.
French courts are divided. A French Court of Appeals held that “the right to accept or refuse the removal of the children’s residence” outside of a region was “a joint exercise of rights of custody.” Ministére public v. M. B. (CA, Aix-en-Provence, 6e ch., Mar. 23, 1989), in 79 revue critique de droit international privé 529, 533-535 (July-Sept. 1990). A trial court in a different region of France rejected this *18 view, relying on the mother’s “fundamental liberty” to establish her domicile. See Procureur de la République de Péri-gueux v. Mme S. (TGI, Périgueux, Mar. 17,1992), in 82 Revue Critique de Droit International Privé 650, 651-653 (Oct.Dee. 1993).
Scholars agree that there is an emerging international consensus that ne exeat rights are rights of custody, even if that view was not generally formulated when the Convention was drafted in 1980. At that time, joint custodial arrangements were unknown in many of the contracting states, and the status of ne exeat rights was not yet well understood. See 1980 Conférence de La Haye de droit international privé, Enlevement d’enfants, morning meeting of Wed., Oct. 8,1980 (discussion by Messrs. Leal & van Boeschoten), in 3 Actes et Documents de la Quatorziéme Session, pp. 263-266 (1982) (Canadian and Dutch delegates disagreeing whether the Convention protected ne exeat rights, while agreeing that it should protect such rights). Since 1980, however, joint custodial arrangements have become more common. See supra, at 12. And, within this framework, most contracting states and scholars now recognize that ne exeat rights are rights of custody. See, e. g., Hague Conference on Private International Law: Transfrontier Contact Concerning Children: General Principles and Guide to Good Practice § 9.3, p. 43 (2008) (“[Preponderance of the case law supports the view” that ne exeat rights are “rights of custody” (footnote omitted)); Hague Conference on Private International Law: Overall Conclusions of the Special Commission of Oct. 1989 on the Operation of the Hague Convention of 25 Oct. 1980 on the Civil Aspects of International Child Abduction, reprinted in 29 I. L. M. 219, 222, ¶ 9 (1990); Hague Conference on Private International Law: Report of the Second Special Commission Meeting To Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction 11 (1993), reprinted in 33 I. L. M. 225 (1994); Silberman, The Hague Child Abduction Convention Turns *19 Twenty: Gender Politics and Other Issues, 33 N. Y. U. J. Int’l L. & Politics 221, 226-232, and n. 13 (2000); Whitman, Croll v. Croll: The Second Circuit Limits “Custody Rights” Under the Hague Convention on the Civil Aspects of International Child Abduction, 9 Tulane J. Int’l & Comp. L. 605, 611-616 (2001).
A history of the Convention, known as the Pérez-Vera Report, has been cited both by the parties and by Courts of Appeals that have considered this issue. See 1980 Conférence de La Haye de droit international privé, Enlevement d’enfants, E. Pérez-Vera, Explanatory Report (Pérez-Vera Report or Report), in 3 Actes et Documents de la Quator-ziéme Session, pp. 425-473 (1982). We need not decide whether this Report should be given greater weight than a scholarly commentary. Compare Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503-10506 (1986) (identifying the Report as the “official history” of the Convention and “a source of background on the meaning of the provisions of the Convention”), with Pérez-Vera Report ¶8, at 427-428 (“[The Report] has not been approved by the Conference, and it is possible that, despite the Rapporter’s [sic] efforts to remain objective, certain passages reflect a viewpoint which is in part subjective”). It suffices to note that the Report supports the conclusion that ne exeat rights are rights of custody. The Report explains that rather than defining custody in precise terms or referring to the laws of different nations pertaining to parental rights, the Convention uses the unadorned term “rights of custody” to recognize “all the ways in which custody of children can be exercised” through “a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.” Id., ¶¶ 67, 71, at 446, 447-448. Thus the Report rejects the notion that because ne exeat rights do not encompass the right to make medical or some other important decisions about a child’s life they cannot be rights of custody. Indeed, the Re *20 port is fully consistent with the conclusion that ne exeat rights are just one of the many “ways in which custody of children can be exercised.” Id., ¶ 71, at 447.
D
Adopting the view that the Convention provides a return remedy for violations of Tie exeat rights accords with its objects and purposes. The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. See Convention Preamble, Treaty Doc., at 7. Ordering a return remedy does not alter the existing allocation of custody rights, Art. 19, id., at 11, but does allow the courts of the home country to decide what is in the child’s best interests. It is the Convention’s premise that courts in contracting states will make this determination in a responsible manner.
Custody decisions are often difficult. Judges must strive always to avoid a common tendency to prefer their own society and culture, a tendency that ought not interfere with objective consideration of all the factors that should be weighed in determining the best interests of the child. This judicial neutrality is presumed from the mandate of the Convention, which affirms that the contracting states are “[fjirmly convinced that the interests of children are of paramount importance in matters relating to their custody.” Convention Preamble, id., at 7. International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings.
To interpret the Convention to permit an abducting parent to avoid a return remedy, even when the other parent holds a ne exeat right, would run counter to the Convention’s purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes. Ms. Abbott removed A. J. A. from Chile while Mr. Abbott’s *21 request to enhance his relationship with his son was still pending before Chilean courts. After she landed in Texas, the mother asked the state court to diminish or eliminate the father’s custodial and visitation rights. The Convention should not be interpreted to permit a parent to select which country will adjudicate these questions by bringing the child to a different country, in violation of a ne exeat right. Denying a return remedy for the violation of such rights would “legitimize the very action — removal of the child — that the home country, through its custody order [or other provision of law], sought to prevent” and would allow “parents to undermine the very purpose of the Convention.” Croll, 229 F. 3d, at 147 (Sotomayor, J., dissenting). This Court should be most reluctant to adopt an interpretation that gives an abducting parent an advantage by coming here to avoid a return remedy that is granted, for instance, in the United Kingdom, Israel, Germany, and South Africa. See supra, at 16.
Requiring a return remedy in cases like this one helps deter child abductions and respects the Convention’s purpose to prevent harms resulting from abductions. An abduction can have devastating consequences for a child. “Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse.” H. R. Rep. No. 103-390, p. 2 (1993). A child abducted by one parent is separated from the second parent and the child’s support system. Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues. See N. Faulkner, Parental Child Abduction is Child Abuse (1999-2006), http:// www.prevent-abuse-now.com/unreport.htm (as visited May 13,2010, and available in Clerk of Court’s case file). A child abducted at an early age can experience loss of community and stability, leading to loneliness, anger, and fear of abandonment. See Huntington, Parental Kidnapping: A New *22 Form of Child Abuse (1984), in American Prosecutors Research Institute’s National Center for Prosecution of Child Abuse, Parental Abduction Project, Investigation and Prosecution of Parental Abduction (1995) (App. A). Abductions may prevent the child from forming a relationship with the left-behind parent, impairing the child’s ability to mature. See Faulkner, supra, at 5.
IV
While a parent possessing a ne exeat right has a right of custody and may seek a return remedy, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. One exception states return of the child is not required when “there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.” Art. 13(b), Treaty Doc., at 10. If, for example, Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer “psychological harm” or be placed “in an intolerable situation.” See, e.g., Baran v. Beaty, 526 F. 3d 1340, 1352-1353 (CA11 2008); Walsh v. Walsh, 221 F. 3d 204, 220-221 (CA1 2000). The Convention also allows courts to decline to order removal if the child objects, if the child has reached a sufficient “age and degree of maturity at which it is appropriate to take account of its views.” Art. 13(b), Treaty Doc., at 10. The proper interpretation and application of these and other exceptions are not before this Court. These matters may be addressed on remand.
* * *
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 “Residence” can also refer to “[t]he place where a corporation or other enterprise does business or is registered to do business.” Black’s Law Dictionary 1423. Earlier this Term, we recognized the self-evident principle that a corporation’s principal “place” of business for diversity jurisdiction purposes is a single location “within a State” and “not the State itself.” Hertz Corp. v. Friend, 559 U. S. 77, 93 (2010).