RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARIO LUIS GONZÁLEZ PLIEGO,

*Petitioner-Appellee,*

*v.*

No. 15-5895

AMANDA LEIGH HAYES,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:15-cv-00146—Thomas B. Russell, District Judge.

Argued: September 14, 2016

Decided and Filed: December 5, 2016

Before: ROGERS, SUTTON, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Laurel King-Davis, KENTUCKY LEGAL AID, Madisonville, Kentucky, for Appellant. Rebecca K. McKelvey, STITES & HARBISON PLLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Laurel King-Davis, KENTUCKY LEGAL AID, Madisonville, Kentucky, for Appellant. Rebecca K. McKelvey, Brenton H. Lankford, STITES & HARBISON PLLC, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge. The Hague Abduction Convention, which is implemented by statute in the United States, requires the return of abducted children to the state (i.e., nation) of habitual residence, so that the courts of that state may resolve custody issues. This case involves

1

an exception that applies when there is clear and convincing evidence that there is a "grave risk" that the child's return would "place the child in an intolerable situation." The mother is American and the father is Spanish, but the state of habitual residence is Turkey, where the father is assigned as a Spanish diplomat. The mother has twice removed the child to the United States, and twice been ordered by the district court below to return the child to Turkey. The mother now appeals the second return order, arguing that there is grave risk of an "intolerable situation" because the father's diplomatic status undermines the ability of the Turkish courts to properly adjudicate custody. While the "intolerable situation" exception does extend to situations where custody cannot be practically or legally adjudicated in the state of habitual residence, that is not the case here because—as found by the district court—the waiver by the Spanish government of the father's diplomatic immunity sufficiently permits the Turkish courts to adjudicate custody. The district court accordingly properly ordered the return of the child.

I.

Respondent Amanda Hayes is a U.S. citizen who grew up in Kentucky. Petitioner Mario Pliego is a Spanish diplomat, whose service requires him to move from country to country every few years. Hayes and Pliego married in 2009 and had their only child in 2011. In 2012, the family moved to Turkey, where Pliego served in the Spanish embassy in Ankara.

At some point after the birth of their child, Hayes's and Pliego's marriage began to deteriorate. In April 2014, Hayes took the child from Turkey to Kentucky and informed Pliego she would not return. In response, in August 2014, Pliego filed his first petition for the child's return under the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 (2012) ("ICARA"), which implements the Convention on the Civil Aspects of International Child Abduction, Oct. 10, 1980, 1343 U.N.T.S. 89; 19 I.L.M. 1501 (the "Hague Abduction Convention" or the "Convention"). Pliego filed his petition in the United States District Court for the Western District of Kentucky. As required under ICARA and the Hague Abduction Convention, the court first determined the child's country of habitual residence, which in this case was Turkey. *Pliego v. Hayes*, 86 F. Supp. 3d 678, 696–97 (W.D. Ky. 2015) ("*Pliego I*"). The court acknowledged that none of the family members were Turkish, but nevertheless reasoned that the child had spent most of his young life there. *Id.* Next, the court held that the

removal of the child from Turkey violated Pliego's joint custody rights under the laws of that country. *Id.* at 697–98. The court held that Pliego had therefore established a prima facie case that the child should be returned to Turkey, shifting the burden to Hayes to present her affirmative defenses. *Id.*

Hayes invoked Article 13(b) of the Hague Abduction Convention, which creates an affirmative defense to a prima facie case for a child's return if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Abduction Convention art. 13(b). Hayes alleged that Pliego had abused the child, exposing him to "physical or psychological harm." In particular, she alleged that Pliego used to yell at, pinch, and grab the child, leaving bruises, and also that Pliego had "force-fed" the child by continuing to put food in his mouth after he was full, causing him to vomit. Hayes alleged that Pliego had abused her as well. In particular, she alleged that Pliego had, on various occasions, flown into a rage and squeezed, grabbed, or pushed her, leaving bruises; that Pliego had verbally abused and threatened her in front the child; and that he had raped her on multiple occasions. Pliego denied the allegations. The court carefully considered Hayes's allegations and noted that it found both Pliego and Hayes to be credible witnesses, and therefore reasoned that "the truth lies somewhere in the middle." *Pliego I*, 86 F. Supp. 3d at 701. Accordingly, without passing judgment on whether the abuse had occurred, the court held that the evidence of the "physical or psychological harm" was not "clear and convincing," as would be required to prevent the child's return. *Id.* at 702–03 (applying 22 U.S.C. § 9003(e)(2) (2012)). Therefore, the court held that Hayes could not overcome Pliego's prima facie case that the child had been wrongfully removed. *Id.* The court ordered that the child be returned to Turkey. *Id.* at 703. There was no appeal.

Within a few days of the court's order in January 2015, Pliego and the child returned to Turkey. Hayes returned to Turkey separately. Hayes petitioned one Turkish court for an exit ban on the child, which was granted. She petitioned another Turkish court for temporary custody, which was also granted. On February 19, with the temporary custody order in hand, Hayes went to Pliego's home with several Turkish police officers and took the child.

Pliego then filed a motion in Turkish court to dismiss Hayes's temporary custody order. As noted above, Pliego is a Spanish diplomat. He therefore asserted in Turkish court that he enjoyed diplomatic immunity, such that a Turkish court could not adjudicate the custody of his child. *See* Vienna Convention on Diplomatic Relations art. 31, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. In support of this petition, the Turkish Ministry of Foreign Affairs, the Turkish Ministry of Justice, and the Ankara Prosecutor sent letters to the Turkish court suggesting that the court respect Pliego's immunity. The Turkish court granted Pliego's request, dismissing the temporary custody order that had been in Hayes's favor.

Pliego then tried to get the child back. In March 2015, Pliego and Turkish police officers arrived at the address that Hayes had given the Turkish courts. However, both Hayes and the child had disappeared. Hayes had learned that her temporary custody order had been dismissed and had taken the child to a "safe house" established to protect victims of domestic violence. By moving from safe house to safe house, Hayes and the child were able to evade detection by Turkish police. After a month or so of such travel, Hayes left Turkey by boat, which allowed her to circumvent the exit ban on the child. She traveled by boat from Turkey to Albania, and then flew to the United States in early April.

In June 2015, Pliego filed his second petition in the same U.S. district court for the return of the child under ICARA. Pending its decision, the court granted Pliego temporary custody of the child within Kentucky or Tennessee, and Pliego took the child to live with him in Nashville, Tennessee, during the litigation. Pliego also took steps for his diplomatic immunity to be waived, which would be necessary for Turkish courts to adjudicate the child's permanent custody if his second ICARA petition was successful and the child was returned to Turkey. Accordingly, in May and July of 2015, the Spanish Embassy sent diplomatic notes to Turkish authorities waiving Pliego's immunity of jurisdiction and execution with regard to the custody case. However, these notes emphasized that this waiver applied only to the custody dispute for Pliego's son, and not to any other civil or criminal matters connected to it.

During the child's stay with Pliego in Nashville, Hayes was allowed visits in public places. During one of these visits, Hayes noticed markings on the child's body, which she believed to be bruises. She photographed these bruises, showed them to the child's doctor, and

later submitted the photographs to the district court. The doctor could not conclude whether the bruises were evidence of abuse, but nevertheless alerted child services. Pliego and his mother, who was also staying in Nashville, later testified that the "bruises" were actually mosquito bites the child had received while playing with Pliego in the backyard of their rented home.

At the beginning of the litigation for Pliego's second petition, the parties stipulated that Turkey was the child's country of habitual residence and that Hayes had violated Pliego's custody rights by removing him from Turkey, establishing a prima facie case that the child should be returned unless Hayes could make out an affirmative defense under Article 13(b) of the Hague Abduction Convention. *Pliego v. Hayes*, No. 5:15–CV–00146, 2015 WL 4464173, at *7 (W.D. Ky. July 21, 2015) ("*Pliego II*"). Furthermore, in making out her affirmative defense, Hayes largely forwent a re-argument that the child faced a "grave risk [of] physical or psychological harm," one of the prongs of Article 13(b). Instead, she focused on the other prong of Article 13(b), arguing primarily that the child faced an "intolerable situation" because Turkish courts could not properly adjudicate the custody dispute or protect the child from abuse due to Pliego's diplomatic status.

The district court, however, found Hayes's argument unpersuasive. First, the court held that the alleged bruises were simply not enough to show abuse, finding credible Pliego's and his mother's testimony that the "bruises" were actually mosquito bites. *Pliego II*, 2015 WL 4464173, at *8. Second, the court found that Pliego's immunity had been successfully waived, such that the custody dispute could go forward. *Id*. at *10. The court recognized that Pliego still retained his diplomatic immunity for non-custody matters, as well as his diplomatic inviolability, but reasoned that this was not enough to prevent adjudication of the central custody dispute. *Id.* Third, the court found that Hayes had produced "scant evidence" of Pliego's "undue influence" with Turkish authorities. *Id.* The court found that custody litigation could therefore proceed in Turkey and held that Hayes had failed to make out a defense under Article 13(b) of the Convention. *Id.* The court announced its opinion verbally at the end of the last evidentiary hearing, and then issued a written opinion detailing its reasoning a few days later. *Id.* at *11. As required under ICARA's fee-shifting provisions, 22 U.S.C. § 9007(b)(3) (2012), the court held in

a separate order that Pliego was entitled to an award of $100,471.18 in attorneys' fees and costs. Hayes appealed.

## II.  Mootness

As an initial matter, this court must satisfy itself that this case is not moot, such that it may consider Hayes's appeal.  By appealing *Pliego II*, Hayes is asking in effect for a "re-return" order instructing that the child be brought back from Turkey to the United States.  Such a re-return order may be difficult to enforce, but this alone does not render an ICARA case moot, *Chafin v. Chafin*, 133 S. Ct. 1017, 1023–26 (2013).  Furthermore, the essential facts have not changed since Hayes's appeal of *Pliego II*.  The child is still in Turkey.  An exit ban still prevents either parent from taking him outside of that country.  Pliego has been reassigned to the Spanish Embassy in Ukraine, but remains on secondment at his country's embassy in Ankara, such that he continues to enjoy diplomatic immunity in Turkey.  Finally, Turkish courts are still adjudicating the underlying custody dispute.  Accordingly, this case is not moot, and we have jurisdiction to decide the appeal.

## III.  Intolerable Situation

The posture of this case leaves us with essentially one merits issue: whether the child faces an "intolerable situation" under Article 13(b) of the Hague Abduction Convention.  In *Pliego I*, Hayes argued that the child faced a "grave risk [of]. . . physical or psychological harm," the first prong under Article 13(b).  However, she does not rely on this treaty language in her appeal in this case.  Furthermore, she does not challenge the district court's determinations that Turkey is the child's country of habitual residence and that the child was removed from Turkey in violation of Pliego's custody rights.  Her remaining argument is that the child faces an "intolerable situation" upon his return to Turkey, the second prong under Article 13(b), because Turkish courts are unable to properly adjudicate the custody dispute or protect the child in the event of abuse.  To support this argument on appeal, Hayes points to Pliego's diplomatic immunity, his alleged "undue influence" with Turkish courts, and his alleged prior abuse.

In short, even though a showing that Turkish courts could not properly adjudicate custody in this case could amount to an intolerable situation, the district court did not clearly err as a matter of fact in finding that Turkish courts could adjudicate custody.

A.

This case would be an easy one if we could simply hold that Hayes's inability-to-adjudicate argument was irrelevant to the "intolerable situation" prong of Article 13(b). Pliego arguably contends as much. He asserts that Hayes has cited no precedent in support of her interpretation of an "intolerable situation." Furthermore, the few cases that do discuss an "intolerable situation" focus on "sexual[] abuse" and the "civil stability" of the child's country of habitual residence, rather than the ability of foreign courts to adjudicate the dispute. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) (quoting State Department Public Notice 957, 51 Fed. Reg. 10,494, 10,510 (March 26, 1986)); *Mendez-Lynch v. Mendez-Lynch*, 220 F. Supp. 2d. 1347, 1364–65 (M.D. Fla. 2002). Pliego therefore appears to be asking us to dismiss Hayes's argument as an unwarranted "extension of the law."

The treaty phrase "intolerable situation," however, can encompass situations where the courts of the state of habitual residence are practically or legally unable to adjudicate custody. This conclusion is supported by the text of the Hague Abduction Convention, the object and purpose of the Convention, and the subsequent practice of the parties to the Convention. Text, object and purpose, and subsequent practice are all set forth as the primary means of treaty interpretation in the Vienna Convention on the Law of Treaties art. 31, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679 ("VCLT"). Our sister circuits have applied the VCLT as an articulation of the customary international law of treaty interpretation, even though the United States is not a party to the treaty itself. *See Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008); *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n.40 (11th Cir. 1999); *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638 n.9 (5th Cir. 1994). Furthermore, the Supreme Court has relied on similar tools when interpreting other provisions of the Hague Abduction Convention, which is incorporated into U.S. law under ICARA. 22 U.S.C. § 9003(d) (2012). For example, in *Lozano v. Montoya Alvarez*, the Court considered the text of the relevant provision of the Convention, the contracting parties' "intent," and how the courts of

other contracting parties had applied the relevant provision. 134 S. Ct. 1224, 1229, 1232–33 (2014). Similarly, in *Abbott v. Abbott*, the Court considered the text of the Convention, its "objects and purposes," and "the views of other contracting states" in order to interpret another provision of the Convention. 560 U.S. 1, 10, 16, 20 (2010).

The text of Article 13(b) supports the interpretation that an "intolerable situation" can encompass situations where one parent seeks to return a child to a country where courts are unable to adjudicate custody. The customary rules of treaty interpretation begin with the "ordinary meaning to be given to the terms of the treaty." VCLT art. 31. Similarly, under U.S. domestic law, "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott*, 560 U.S. at 10 (quoting *Medellín v. Texas*, 552 U.S. 491, 506 (2008)). The ordinary meaning of "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" suggests that an "intolerable situation" must be different from "physical or psychological harm," but nevertheless serious. First, "otherwise" means "in a different way or manner," "in different circumstances," or "in other respects." Webster's Third New International Dictionary 1598 (2002). Therefore, an "intolerable situation" must be different in way or manner from physical or psychological harm. Second, "tolerable" means "capable of being borne or endured," or "meeting some minimum standard of acceptability." *Id.* at 2405. "Intolerable" means "not tolerable." *Id.* at 1185. Therefore, whatever an "intolerable situation" means within the context of the Hague Abduction Convention, it must mean something serious: either it cannot be borne or endured, or it fails some minimum standard of acceptability.

The Convention's object and purpose also support an interpretation of an "intolerable situation" that includes the inability of the state of habitual residence to adjudicate custody. The terms of a treaty must be considered "in their context and in the light of [the treaty's] object and purpose." VCLT art. 31. Similarly, in *Abbott*, the Supreme Court considered the "objects and purposes" of the Hague Abduction Convention and concluded that "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. 20. Viewing the terms "otherwise . . . intolerable situation" in light of the Supreme Court's interpretation of the purpose

of the treaty, such an "intolerable situation" can be said to exist when the courts of the child's country of habitual residence are unable to make decisions regarding custody rights. To conclude otherwise would defeat the Convention's object and purpose, because custody could not be adjudicated at all.

The practice of other state parties to the Convention further supports interpreting an "intolerable situation" to encompass the inability of a state of habitual residence to adjudicate custody. *See* VCLT art. 31(3)(b). The Supreme Court has correspondingly considered foreign courts' interpretations of the relevant provisions of the Hague Abduction Convention. *See Lozano*, 134 S. Ct. at 1233; *Abbott*, 560 U.S. at 16–17.

First, the courts of many Contracting Parties consider an "intolerable situation" to be distinct from "physical or psychological harm." Family courts in Australia, Canada, Hong Kong, and New Zealand read Article 13(b) disjunctively, treating an "intolerable situation" as a separate defense from a "grave risk . . . of physical or psychological harm." *See Gsponer v. Johnstone*, 12 Family Law Reports 755, (Family Court of Australia 1988);[1] *Jabbaz v. Mouammar*, 226 Dominion Law Reports 4th 494, paras. 22–23 (Court of Appeal for Ontario, Canada, 2003);[2] *LPQ v. LYW*, [2014] Hong Kong Court of First Instance 2324, paras. 44–56[3]; *Damiano v. Damiano*, [1993] New Zealand Family Law Reports 548 (Family Court).[4] This practice confirms this court's interpretation of the ordinary language of Article 13(b) that "physical and psychological harm" and "intolerable situation" are two different things.

Second, the courts of many Contracting Parties have also held that such an "intolerable situation" exists when the courts of the country of habitual residence are unable to adjudicate the

---

[1]Available at https://assets.hcch.net/incadat/fullcase/0255.htm ("[Counsel for the respondent] submitted that the three categories were to be read disjunctively and in particular the physical or psychological harm referred to in (i) or (ii) above was in no way qualified by the term 'otherwise . . . in an intolerable situation', although he conceded that it was necessary to establish a 'grave risk' of any one of those events . . . . This accords with the views of the [prior precedent by the Australian Court of Appeals.]").

[2]Available at http://www.incadat.com/index.cfm?act=search.detail&cid=757&lng=1&sl=2.

[3]Available at http://www.hklii.hk/eng/hk/cases/hkcfi/2014/2324.html

[4]Available at https://assets.hcch.net/incadat/fullcase/0091.htm ("The factual position in Canada and the ability of law to control and monitor are also clearly relevant to the second leg, that the children would otherwise be placed in 'an intolerable situation'. It should be noted that quite deliberately the requirement of the making out of this condition as set out in § 13(1)(c)(ii) is disjunctive from the first requirement.").

custody dispute properly, for whatever reason. For example, a Scottish court held that two children faced both a grave risk of harm and an intolerable situation when there was medical evidence of abuse, yet French authorities appeared "incapable or unwilling" to protect the children. *Q., Petitioner*, [2001] Scots Law Times 243, paras. 65–67 (Scottish Court of Session, Outer House). In particular, multiple medical and psychological professionals examined one of the children and reported signs of physical and sexual abuse, including bruises on the child's legs, physical evidence of penetration, and the child's testimony of inappropriate touching. *Id.* at paras. 16, 22, 60. Nevertheless, French prosecutors refused to extend a temporary custody order that would allow the children to escape return to their abusive father, *id.* at paras. 30–35, and French courts appeared unable or unwilling to intervene in a timely manner, *id.* at paras. 38–40. Similarly, Australian courts consider whether one parent is able to get a visa for the country to which the child was sought to be returned. *See Director-General, Department of Families, Youth and Community Care of Queensland v. Hobbs Julie*, paras. 94–101, (unreported, Family Court of Australia, Lindenmayer, J., 24 Sept. 1999).[5] If a parent is entirely legally barred from representing his or her and the child's interest in the subsequent litigation, Australian courts may decline to return the child. *State Central Authority of Victoria v. Ardito*, (unreported, Family Court of Australia, Joske, J., 29 Oct. 1997).[6] In addition, at least one Canadian court has denied a child's return in part because the father was legally barred from leaving the country to which the child was brought, such that the father was entirely precluded from participating in custody proceedings abroad. *Chan v. Chow*, 199 Dominion Law Reports 4th 478, paras. 59, 65–66 (Court of Appeals for British Columbia, Canada, 2001).[7]

Also, when courts of other Contracting Parties have ordered the return of a child, they have often made clear that they did so only on the assumption that courts in the country of habitation could adjudicate custody and protect him or her. *See KG v. CB & others*, 2012 (4) South African Law Reports 136, para. 54 (Supreme Court of Appeal);[8] *D. I., Petitioner*, [1999]

---

[5]Available at https://assets.hcch.net/incadat/fullcase/0294.htm

[6]Available at http://www.incadat.com/index.cfm?act=search.detail&cid=283&lng=1

[7]Available at http://www.canlii.org/en/bc/bcca/doc/2001/2001bcca276/2001bcca276.html

[8]Available at http://www.justice.gov.za/sca/judgments/sca_2012/sca2012-017.pdf.

Family Law Reports 126, para. 97–08 (Scottish Court of Session, Outer House); *Laing v. Central Authority*, (1996) 21 Family Law Reports 24 (Family Court of Australia).[9] All of these cases confirm that the inability of the courts of the child's country of habitual residence to properly adjudicate custody may amount to an "intolerable situation."

B.

Hayes, however, has failed to establish an "intolerable situation" under the facts of this case. Review of the facts in this context is for clear error. *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007). None of the district court's findings of fact are clearly erroneous. Furthermore, these findings of fact clearly establish that Turkish courts can properly adjudicate the underlying custody dispute and protect the child.

First, the district court found that Pliego's immunity has been waived to the extent necessary for the custody dispute. *Pliego II*, 2015 WL 4464173, at *10. This finding is not clearly erroneous. The district court relied on its finding on the Spanish diplomatic note from July 2015, by which the Spanish government waived Pliego's immunity of jurisdiction and execution for the custody dispute in both relevant Turkish courts, and also relied on the expert testimony that this would be sufficient for the case to go forward. *Id.* at *10. The court acknowledged that Pliego continued to enjoy immunity and inviolability for other, related matters—for example, Pliego remains immune from a hypothetical prosecution for domestic violence. *Id.* However, the district court found that Turkish courts could still adjudicate the central custody case. *Id.* Thus, any defects in Turkish courts' ability to adjudicate fall far short of what is required for an "intolerable situation." In contrast, in Australian courts, an "intolerable situation" has been said to exist only when one party was entirely precluded from participating in the custody dispute. *E.g., Director-General, Department of Families, Youth and Community Care of Queensland v. Hobbs Julie*, paras. 94–101 (unreported, Family Court of

---

[9]Available at https://assets.hcch.net/incadat/fullcase/0228.htm ("It would be inconceivable that the judicial system of the State of Georgia in the United States would not be able to protect the child from any significant risk of physical and/or psychological harm arising from the implementation of this court's order. In addition, as indeed the trial judge found, the evidence was that the court in the State of Georgia having Jurisdiction in disputes relating to children applies the principle that the best interests of the child are the paramount consideration.").

Australia, Lindenmayer J., 24 Sept. 1999);[10] *State Central Authority of Victoria v. Ardito* (unreported, Family Court of Australia, Joske J, 29 Oct. 1997).[11] Here, Hayes is free to litigate custody to the full extent necessary in Turkish courts, notwithstanding her inability to bring a criminal complaint against Pliego for domestic abuse.

Second, the district court found that there was "scant evidence" that Turkish courts were corrupt or unduly influenced. *Pliego II*, 2015 WL 4464173, at *10. This finding is also not clearly erroneous. For evidence of the alleged corruption or undue influence, Hayes points to the letters that the Turkish Ministry of Justice, Ministry of Foreign Affairs, and Ankara Prosecutor sent to Turkish courts suggesting that Pliego's diplomatic immunity be respected. However, the Turkish government's actions here are remarkably similar to how the U.S. State Department suggests immunity should apply on behalf of foreign diplomats in U.S. courts. *See, e.g.*, *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 126 (D.D.C. 2009); *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 192 (D.D.C. 2007). In other words, these letters are not evidence of corruption or undue influence, but simply evidence of how diplomatic immunity is enforced in domestic courts.

Third, the district court found that Hayes's allegations of abuse were not enough to prevent the child's return. Hayes and the district court disagree as to the proper way to analyze these allegations. The district court considered these allegations under the "physical or psychological harm" prong. *Pliego II*, 2015 WL 4464173, at *8. However, in *Pliego II*, Hayes generally did not argue that these allegations posed a "grave risk" of exposure to "physical or psychological harm." Instead, she argued that an "intolerable situation" arises from a *combination* of the alleged abuse and Pliego's immunity and inviolability. In effect, Hayes contends that Pliego might abuse the child and Turkish authorities would be unable to intervene, creating an "intolerable situation."

Even if the district court considered Hayes's argument under the wrong prong, her argument must fail. In *Pliego II*, the only evidence of abuse was the bruises on the child's body that Hayes discovered and photographed. *Pliego II*, 2015 WL 4464173, at *8. However, the

---

[10]Available at https://assets.hcch.net/incadat/fullcase/0294.htm.

[11]Available at http://www.incadat.com/index.cfm?act=search.detail&cid=283&lng=1.

district court found credible Pliego's and his mother's testimony that these "bruises" were in fact mosquito bites and not evidence of abuse at all. *Id.* This finding is not clearly erroneous. In addition, the district court found that Pliego's immunity had been waived with regard to custody, and that Pliego had "indicated his intentions and willingness to litigate the custody issue in Turkey, and to comply with all orders of the Turkish courts." *Id.* at \*10. As noted above, these findings are not clearly erroneous either. Therefore, even if there is any abuse, Turkish courts now have jurisdiction over Pliego with regard to custody, and could therefore respond to any abuse by issuing a custody order in Hayes's favor. Accordingly, no "intolerable situation" arises from a combination of abuse and immunity.

Hayes urges this court to consider the allegations of abuse from *Pliego I* as part of "a broad review of the past history of domestic violence." To the extent that the allegations from *Pliego I* are not barred by collateral estoppel, Hayes still cannot establish that Pliego might abuse the child and Turkish authorities would not be able to intervene. In *Pliego I*, the district court considered both sides' testimony regarding the abuse and found both Pliego and Hayes to be "credible witnesses," which led the district court "to believe that the truth lies somewhere in the middle." *Pliego I*, 86 F. Supp. 3d at 701. This finding is not clearly erroneous and could not be overturned, even if it were properly on appeal. Furthermore, as noted above, the waiver of Pliego's immunity means that Turkish courts can grant custody to Hayes in the event of abuse. Therefore, even if this court were to consider the facts from *Pliego I*, the district court did not clearly err in declining to determine that Turkish courts' limited jurisdiction over Pliego can combine to create an "intolerable situation."

Hayes made two more arguments before the district court that she mentions in her statement of the case on appeal. First, Hayes claims that even if Pliego has properly waived his diplomatic immunity, he has not waived his diplomatic inviolability, a separate privilege he enjoys under international law. *See* Vienna Convention on Diplomatic Relations arts. 22, 29, 30, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. According to Hayes, Pliego's continuing immunity could prevent Turkish police from, for example, entering his residence to enforce a custody order. Second, Hayes claims that, at the time of *Pliego II*, she had no visa to return to Turkey, no money to pursue litigation in Turkey, and risked arrest upon her return to Turkey for

violating the exit ban on the child. *Pliego II*, 2015 WL 4464173, at *10. Although Hayes alludes to these two arguments in her brief's statement of the case, she does not make them in her arguments section. She does not mention her difficulties in litigating custody in her arguments section at all. She mentions Pliego's continuing diplomatic inviolability only in passing, without explaining how it would prevent custody adjudication or protection of the child. Hayes has thus forfeited these arguments on appeal, and this court need not consider them.

Finally, Hayes argues that, in determining whether the child faced an "intolerable situation," the district court failed to weigh and consider certain evidence, consider all of the evidence together, make appropriate findings of fact separate from conclusions of law, and properly set forth its reasoning in a written opinion. In particular, Hayes claims that the district court did not sufficiently analyze the issue of undue influence, the alleged conflicts in expert testimony on diplomatic immunity, and her allegations of abuse from *Pliego I*. She cites a Third Circuit case for the proposition that a district court opinion should be overturned for failing to consider evidence or considering it in a compartmentalized way. *In re Adan*, 437 F.3d 381, 396 (3d Cir. 2006). She also cites a Seventh Circuit case for the proposition that a district court opinion should be overturned for failing to make separate findings of fact and conclusions of law. *Khan v. Fatima*, 680 F.3d 781, 785–86 (7th Cir. 2012) (applying Fed. R. Civ. P. 52(c)).

These arguments lack merit. The district court issued a lengthy written opinion that carefully set forth all of the relevant evidence, and then made factual findings based on that evidence. These factual findings are not clearly erroneous, as established above. The district court's opinion also specifically considers Pliego's undue influence and the alleged conflicts in expert testimony in drawing its factual and legal conclusions. There is no indication that the district court did not properly analyze this evidence.

The district court's careful and lengthy written opinion also renders inapposite the cases cited by Hayes. In *Adan*, the district court issued a one-sentence written order granting a father's petition of return, which was supported only by "some oral comments regarding the credibility of the witnesses and their testimony in the course of [its] decision." 437 F.3d at 387. Furthermore, the district court in *Adan* ignored or rationalized substantial evidence of abuse, including a pubic hair found in the child's vagina, as well as the child's testimony that the father had put his tongue

in her mouth, bathed with her, and "put[] something hot in her butt." 437 F.3d at 396–99. This contrasts starkly with the district court's lengthy written opinion in this case, which supported the court's previous verbal order and carefully considered all of the evidence. In *Khan*, the district court issued a two-page order with no relevant findings of fact and the simple conclusion that the mother had failed to meet her burden of proof. 680 F.3d at 785–86. This also contrasts starkly with the district court's opinion in this case, which carefully sets out the relevant facts and law and considers these facts and law in great detail.

Hayes has accordingly not established that the child faces a grave risk of an "intolerable situation," and we need not consider Pliego's alternative arguments that Hayes's "intolerable situation" defense is barred by res judicata or collateral estoppel.

## IV.  Pliego's Fees Incurred on Appeal

Finally, Pliego requests an award of attorneys' fees, lawsuit expenses, and costs incurring during this appeal. Pliego's request is based on the fee-shifting provisions of the Hague Abduction Convention and ICARA. Article 26 of the Hague Abduction Convention provides that "[u]pon ordering the return of a child . . . the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, . . . to pay necessary expenses incurred by or on behalf of the applicant." Hague Abduction Convention art. 26. The ICARA provision implementing this language provides that "[a]ny court ordering the return of the child pursuant to an action brought under [ICARA] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner." 22 U.S.C. § 9007(b)(3) (2012).

According to the plain meaning of both the Convention and ICARA, these provisions apply only to courts "ordering the return of the child." Thus, this provision does not apply to this court—which is not a court ordering the return of the child, but rather a court affirming another court's order to return the child. This interpretation is supported by the decisions of sister circuits that have addressed the issue. *Hollis v. O'Driscoll*, 739 F.3d 108, 113 (2d Cir. 2014); *West v. Dobrev*, 735 F.3d 921, 933 n.9 (10th Cir. 2013).

However, we do not reach the issue of whether the district court that ordered the child's return in *Pliego II* may, upon separate motion, award fees incurred on this appeal.

V.

For the foregoing reasons, we AFFIRM the judgment of the district court.