ROGERS, Circuit Judge.
In this difficult case under the Hague Abduction Convention, the district court ordered two children to be returned to Mexico after carefully analyzing whether, under the terms of the Convention, returning them posed “a grave risk” of “exposing] [them] to physical or psychological harm or otherwise placing] [them] in an intolerable situation.” The district court concluded that the return posed no such grave risk. Because of a stay pending appeal entered by this court, however, the return has not been carried out, and circumstances have changed materially. Most significantly, neither parent now resides in Mexico, and if the children are returned *473 there, the Mexican court may no longer be able, practically or legally, to resolve the custody dispute between two American parents over their American children. Under our precedent, that potential inability of the foreign court to resolve the custody dispute may pose “a grave risk” of “an intolerable situation” to the children. A return order is premised on the risks at the time of the actual return, and the district court has not had a meaningful chance to evaluate, in light of the material change in circumstances, whether there is a “grave risk” under the Convention when the children would now be returned. In this unusual circumstance, a remand is warranted so that the district court may consider in the first instance whether returning the children to Mexico will now expose them to “a grave risk” of harm or of an intolerable situation.
I.
Mr. Steven Neumann sued his wife, Ms. Julie Neumann, seeking an order to return their three children to Mexico under the Hague Abduction Convention. The Hague Convention on the Civil Aspects of International Child Abduction (the “Hague Abduction Convention”), Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, tries to solve the jurisdictional problem that arises when one parent, often during a marital dispute, internationally distances the marital children from the other parent, íhe U.S. Congress has implemented the Convention, and has adopted the Convention’s aims, in the International Child Abduction Remedies Act (“ICARA”). 22 U.S.C. §§ 9001-11. When the children’s removal violates the distanced parent’s custodial rights under the laws of the children’s country of habitual residence, the Convention generally requires member states to return the children, so that the proper court may adjudicate custody over the children. Hague Abduction Convention, art. 1; 22 U.S.C. § 9001(a)(4). “That rule ... was designed to protect the interests of the state of habitual residence in determining any custody dispute, and to deter parents from unilaterally removing children in search of a more sympathetic forum.” Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007) (citation omitted). “The driving objective of the [Convention] is to facilitate custody adjudications, promptly and exclusively, in the place where the child habitually resides.” Chafin v. Chafin, 568 U.S. 165, 133 S.Ct. 1017, 1028, 185 L.Ed.2d 1 (2013) (Ginsburg, J., concurring).
Consistent with the aims of the Convention, this court, when faced with the claim under ICARA that a parent has wrongfully removed children from their country of habitual residence, limits its adjudication to the abduction claim. It does not adjudicate the merits of any underlying custody dispute. Friedrich v. Friedrich (Friedrich II), 78 F.3d 1060, 1063 (6th Cir. 1996). However, importantly for this case, return need not be ordered where “there is a grave risk that [the] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable position.” Hague Abduction Convention, art. 3.
The Neumanns had been living in Michigan for more than a decade when they moved to Mexico. After nearly four years in Mexico, during which the three children attended school there and made friends there, Ms. Neumann fled the country to Michigan with them, leaving her husband behind. Just days before Ms. Neumann left Mexico with the children, Mr. Neumann had been drinking heavily again and, while arguing, had pushed Ms. Neumann across the kitchen, leaving her with three broken ribs.
*474 Julie Neumann and Steven Neumann were married in 1997. They have three children: JMN, JSN, and MKN. JMN, a daughter, was born in 1999. JSN and MKN, both sons, were born in 2002 and 2003.
From June 2000 to February 2011, the Neumanns lived in Michigan. In February 2011, the Neumanns moved to Mexico because Mr. Neumann’s employer, Ford Motor Company, assigned him to a new job there. Initially, Mr. Neumann’s assignment in Mexico was scheduled to expire in 2014. But sometime in 2014, Mr. Neumann’s assignment was extended to 2017. The Neu-manns had not decided where to live after that extended assignment. Ms. Neumann has agreed that she was “indecisive” about where they would live. They lived together in Mexico until December 28, 2014, when Ms. Neumann left Mexico with her three children and returned to Michigan.
While they lived in Mexico', the children settled into their new life. They attended the same school, an English-speaking international school, for nearly four years. At school, they participated in school plays and concerts. They made new friends. And while they frequently vacationed in Michigan when school was not in session, and may have considered Michigan to be their home, they planned to stay in Mexico for at least another year, and potentially indefinitely.
Those plans were interrupted in December 2014. The day after Christmas, Mr. and Ms. Neumann had a violent dispute that left Ms. Neumann with three broken ribs and on a plane back to Michigan with the three children. Mr. ánd Ms. Neumann dispute the details of that incident, with the three children largely confirming Ms. Neumann’s story.
According to Ms. Neumann, Mr. Neu-mann had drunk heavily on Christmas Eve and Christmas Day, to the point where he “had fallen ... in the bathroom doorway,” “screaming [for] help,” claiming that he was “bleeding all over,” yelling at Ms. Neumann, and calling her “a stupid F’ing bitch, a good-for-nothing bitch.” Mr. Neu-mann ' admits he “[p]robably” had “too much to drink” on Christmas Day 2014, but not on Christmas Eve. Mr. and Ms. Neumann agree that while Mr. Neumann was in that “intoxicated condition,” on Christmas Day, Ms. Neumann took photographs and videos of him. Ms. Neumann explains, “I felt that maybe if he heard the way he talked to me when he was drunk, he would know how much he was hurting me.” Mr. Neumann did not find out about the photographs and videos until the morning after, when Ms. Neumann showed him how Mr. Neumann was when he was drunk.
According to Mr. Neumann, he then “asked” Ms. Neumann for the phone, so that he could delete the photographs and videos, which he “fear[ed] she would post ... [on] social media.” They “argued,” “raising [their] voices,” until Mr. Neumann “grabbed the phone from her hand” and “ran up the stairs ... into the bedroom,” because Ms. Neumann was “striking [him] with her closed fist” and “punching [him]” in the back. Mr. Neumann then deleted the photos and waited for an hour “to let things cool off.” When he came out and went to the kitchen “to make a cocktail,” Ms. Neumann, who was with JMN, “put her hand on the vodka bottle” and “an argument started.” Mr. Neumann alleges that Ms. Neumann “raised a frying pan” and “struck” him “on the side of the head and then ... on the top of the head.” Mr. Neumann “grabbed a knife” from a “butcher block” and “held it up.” Ms. Neu-mann “was taunting” him, and she “spat upon” him and asked him “go ahead, what are you going to do, you good for nothing drunk?” Then Mr. Neumann “heard” the *475 children behind him, who were screaming at him “to stop.” The children—JMN and JSN—were “on [his] arm after [he] raised the knife.” Mr. Neumann “dropped” the knife. He then “pushed” Ms. Neumann, as he says, “out of my face.” Ms. Neumann then “flew and hit the counter.” Mr. Neu-mann returned to the bedroom “to cool off” and “stayed there for a couple of hours,” and when he returned to the kitchen, “they were missing, gone.”
According to Ms. Neumann, that morning, Mr. Neumann went out to the terrace to smoke a cigarette. When Ms. Neumann followed him to the terrace, before she said anything, he “started saying in all different crazy tones and voices F you, F you, like he was crazy out of his mind.” She suspected that he was still drunk from the night before. She then showed him the recordings of the previous night because she “knew he didn’t remember it” and wanted him to “know how much he was hurting [her] when he dr[a]nk so much.” Upon seeing the recordings, Mr. Neumann “told” Ms. Neumann to delete them, and when Ms. Neumann refused, “he starting screaming.” Then Ms. Neumann returned into the house with the phone and made a sandwich for Mr. Neumann, so that he would sober up. The children returned to the house and pleaded with Mr. Neumann to stop drinking. Mr. Neumann finished his sandwich and went upstairs. When he returned, Ms. Neumann was in the kitchen. He began “hitting” Ms. Neumann and “grabbing” her arm, in trying to take the phone away from her, and “pushed” her, which led to her “flying” from the kitchen to the dining room table. Ms. Neumann grabbed a frying pan and “swung it at him,” but did not hit him. Mr. Neumann then went back upstairs to the bedroom and locked the door. Ms. Neumann followed him and opened the door with a key. Mr. Neumann “threw the phone on the bed” and Ms. Neumann heard him go to the basement. According to Ms. Neumann, JMN, the eldest child, was telling her younger brothers to “go and pack a bag,” because they “had to get out of there,” because “it wasn’t safe,” and “dad was going to kill mom.” After about an hour, Mr. Neumann returned from the basement, and when JMN approached him, called her “ungrateful” and told her “to get out of his life.” By this time, Mr. Neumann was back in the kitchen. Ms. Neumann approached him to tell him that it was “bad enough” that he was hurting her, but that he had “to stop hurting the children.” Mr. Neumann, in response, “grabbed the knife that he had cut his food with” and held “the knife to [Ms. Neumann’s] neck,” “screaming.” Ms. Neumann “heard the kids screaming.” Then she saw the knife “go flying” and Mr. Neumann “threw” her and she “landed” on a wooden chair. She thought her back was “broken.” When she stood up and exclaimed that she thought her back was broken, he said “good for you, you lousy bitch, you deserve worse.”
Ms. Neumann left Mexico with the children on December 28, 2014. Before she left, according to Ms. Neumann, Mr. Neu-mann allegedly threatened to kill her over the phone. In the United States, a hospital determined that Ms. Neumann had three broken ribs, ribs ten to twelve. She has been diagnosed with PTSD. Mr. Neumann reports that he “wonders about the injury.”
The three children have spoken to a court-appointed expert about the incident, and they largely confirm Ms. Neumann’s story. JMN, the eldest child, confirmed that Mr. Neumann held “a sharp steak knife at [Ms. Neumann’s] throat” and that she and her brother JSN “pulled [Mr. Neumann] off [Ms. Neumann].” JMN added that she and her brothers were “trembling” because they were “real scared.” JSN, the middle child, stated that Mr. *476 Neumann “tried to stab” Ms. Neumann, that he pushed her and caused her injury, and that he and JMN “pulled [Mr. Neu-mann] off [Ms. Neumann], he had a knife, he pushed her down.” JMN added that he was “scared and nervous.” MKN, the youngest child, did not report those details to the court-appointed expert, but did say that on that day, his father “screamed at everybody” and told them to get out of the house.
Mr. Neumann admits he is an alcoholic, and the district court agreed with its appointed expert that Mr. Neumann’s alcoholism was “untreated.” The court-appointed expert concluded in particular that Mr. Neumann faces a “clear risk of relapse,” and because Mr. Neumann has suffered “destructive relapses” with binging on alcohol, the expert also concluded that Mr. Neumann’s clear risk of relapse threatens “significant results” to the children.
Mr. Neumann has admitted to two drunk-driving convictions, in 1992 and 1994, for which he was “jailed and detained.” Mr. Neumann has been physically violent with his children before, but not as severely as he was violent with Ms. Neu-mann. JSN, the middle child, - reported to the court-appointed expert that Mr. Neu-mann would “slap [him] on the head for no reason, just a smack.” Now, JSN reports, he “flinch[es] from that if someone puts up their hand.”
The children all report that Mr. Neu-mann is angry, abusive, and frequently drunk. JMN, the oldest child, called him “mentally abusive, both to her mother and to her and her brothers,” According to her, Mr. Neumann would “comet ] home from work angry,” would “yell[ ] at” them, and would “wake up from a dead sleep and yell at [them] for absolutely no reason.” JSN, the middle child, characterized Mr. Neu-mann as “a very angry person” with “a short temper,” who “would play mind games” with him, and who “had a bad drinking problem” to the point that he couldn’t walk straight or “speak right.” MKN, the youngest child, similarly stated that Mr. Neumann “always drank too much, swore at [them], then the next day apologized but it kept happening.” ■
Mr. and Ms. Neumann both filed for divorce. Mr. Neumann filed in Mexico on May 11,2015. Ms. Neumann filed in Michigan on May 12, 2015. Mr. Neumann and Ms. Neumann agree on appeal that the Mexican court entered a unilateral divorce, as Ms. Neumann did not appear.
The district court below conducted a four-day evidentiary hearing on whether the children had been wrongfully removed and whether Ms. Neumann could raise an affirmative defense to their return. The district court also appointed a psychologist to examine the three children.
In August 2015, Dr. Haynes concluded that Mr. Neumann’s alcoholism was “essentially untreated.” Dr. Haynes opined that, if Mr. and Ms. Neumann were to cohabit as they continue their divorce, that cohabitation would subject Mr. Neumann to “the greatest stress and the greatest risks” in these relative circumstances. Observing that when children witness spousal violence, as JSN and MKN did, “some mental health intervention is necessary with the children and the parent prior to reunification,” Dr. Haynes further opined: “It would appear strongly undesirable to require reunification of family members who have been living separately for approximately eight months without this professional intervention work.” Dr. Haynes further explained that the children “have expressed feelings of apprehension regarding reunification with their father” and “say they feel unsafe.” Dr. Haynes concluded, “there are multiple significant risks of different kinds” in returning the children back to Mexico. And while Dr. *477 Haynes did not diagnose the children with PTSD, although Ms. Neumann’s expert previously suggested the children did suffer from PTSD, Dr. Haynes warned that the children are “upset about the father’s behavior in the family, and this needs to be professionally addressed.”
In a supplemental report in November 2015, Dr. Haynes largely reiterated those findings. While Dr. Haynes noted “mild improvement” in the children’s psychological health, he also stated that “all three children continue to be strong and firm about not wanting to return to Mexico at this time,” and “[a]ll three children equally express apprehension of going to Mexico.” Dr. Haynes concluded: “From a psychological standpoint, it would be inappropriate, anxiety-producing, and unwise for the children to be ... physically split up.... At this point all three would view going to Mexico as a highly coercive action against their will and against their intent, regarding which they have significant fears, repetitively addressed with Dr. Ceresnie in psychotherapy.” He also concluded: “In my opinion, the children being with the father unsupervised, such as in Mexico, at this point reflects psychological risk because of his essentially and continuing untreated alcohol abuse problem, now in the added context of divorce and its controversies, stressors, and intensities.”
The district court also interviewed the three children individually, in chambers, with only one law clerk present. The district court reported that, during the interview, “the children did not identify any significant concern about returning, to Mexico.” Furthermore, according to the district court, the children “expressed no fear of any harm, such as physical violence or psychological distress, to which they might be subjected or exposed by their father or by anyone else.”
The district court ruled that the children’s return to Mexico was required by the Convention. The court first determined that Mexico was the country of habitual residence of the children, largely because the children had spent nearly four years in Mexico, during which they attended school there, made friends there, and engaged in extracurricular , activities there. Determining also that Ms. Neumann violated Mr. Neumann’s exercised custodial rights under Mexican law when she took the children to the United States, the district court concluded that the children had been wrongfully removed. The court then rejected Ms. Neumann’s affirmative defenses, concluding in particular that she had not proven, by clear and convincing evidence, that the children faced a grave risk of harm, upon their return to Mexico. As the court explained, while Mr. Neumann’s alcoholism remained untreated, it did not pose a physical danger to the children, because there was no evidence that it ever previously resulted in severe neglect of the children, and because the children to be returned—JSN and MKN—are as young teenagers “in many ways, self-sufficient and can manage most of their basic needs without significant supervision.” The court also explained that “[Mr. Neumann’s] alcohol dependency, and any consequential effect on the children, will be something for the court that makes the custody determination to consider.” The court similarly dismissed other proffered risks as tied not to a return to Mexico, but more specifically to a return to Mr. Neumann’s custody.
Because JMN turned sixteen years old while this action was pending, the Hague Abduction Convention no longer applies to her, Hague Abduction Convention, art. 4, and the district court ordered Ms. Neu-mann to return only JSN and MKN to Mexico. The district court declined to order JSN and MKN into Mr. Neumann’s custody—just back to Mexico.
*478 In ordering Ms. Neumann to return the two children to Mexico, the district court did not address the many accompanying logistics. While the court ordered Ms. Neumann “to make whatever arrangements are necessary to effectuate the [return] order .,including securing valid and up-to-date passports,” and further ordered Mr. Neumann “to execute and transmit to [Ms. Neumann] whatever documents are necessary for [Ms. Neumann] to secure passports and any other documents necessary for the children’s travel to Mexico,” the court did not address who would greet the children at the airport in Mexico and who would take care of them pending a resolution by the Mexican court of temporary custody and then custody. The court likely omitted such guidance because the parties failed to agree to even what the logistical issues were that remained to be resolved. As the district court explained on June 6, 2016:
With regard to [the place where the children will be upon return], again that’s an issue of custody and what’s a fit and proper place for the children to be. I think both parents as well as the children will be better off if they get in front of some judge who can start making rulings about how these children’s lives are going to be handled as we move forward in time. Right now, there’s very little that these two parents can agree on and that’s unfortunate for them, it’s unfortunate for their children, but we’ve got to decide what we can decide, what we should decide and for me to try to decide what is an appropriate location I think is beyond what I’m supposed to be doing under the Hague Convention. Now if somebody thinks otherwise, wants to file some kind of motion, give me some authority, I’m not barring that, but from what I’ve heard up to this point, I’m not of the view that I need to micromanage precisely where these children are going to live in Mexico. I think everyone would be better off getting in front of a judge who can make a custody decision and that judge can decide if Durango or some other location is the appropriate location in which these children should be residing.
Ms. Neumann moved to stay the return order pending appeal. The district court held a hearing on the motion and then denied it. The district court reasoned that the four-factor stay analysis did not warrant a stay, because Ms. Neumann had not shown a substantial likelihood of success on the merits, because the case had already been delayed some time, and because the public interest did not favor a stay. Ms. Neumann then filed an emergency motion in this court, seeking a stay of the district court’s return order. A panel of this court granted the motion in a brief order. The children therefore remain in Michigan pending the resolution of this appeal.
On December 1, 2016, we heard oral arguments. Mr. Neumann’s counsel represented to the court that in November 2016—six months after the district court’s return order—Mr. Neumann returned indefinitely to Michigan after a job reassignment. The counsel also represented to the court that while Mr. Neumann’s stay in Michigan is indefinite, Mr. Neumann may be assigned to a job in India, too. Counsel further represented that if this court were to affirm the district court’s return order, Mr. Neumann would return to Mexico to receive the children.
As things now stand, the children, Mr. Neumann, and Ms. Neumann are all in Michigan. Ms. Neumann and the children have been there for more than two years— since December 2014. Mr. Neumann has been there for about five months—since November 2016. When the district court *479 ordered Ms. Neumann to return the children to Mexico, Mr. Neumann was residing and working in Mexico, potentially giving the Mexican court the jurisdiction over the custody dispute. Under those circumstances, the district court concluded that returning the children would not expose them to a grave risk of harm or of an intolerable situation. But those circumstances have now changed substantially.
On appeal, Ms. Neumann has raised two issues. She argues that the district court clearly erred in concluding Mexico to be the children’s country of habitual residence. She also argues that the district court erred in determining that returning the children to Mexico would not expose the children to a grave risk of physical or psychological harm.
II.
The district court did not clearly err when it found Mexico to be the country of habitual residence of JSN and MKN. When Ms. Neumann took them to the United States, JSN and MKN had been living in Mexico for nearly four years— from February 2011 to December 28, 2014. That was plainly long enough for JSN and MKN to acclimate to their new life. JSN and MKN attended the same school in Mexico for nearly four years. At the school, they made new friends and engaged in extracurricular activities like school plays and concerts. The Neumanns also planned to continue to live in Mexico until 2017—maybe longer. Given those settled ties to Mexico, the district court did not clearly err in concluding that Mexico was the children’s country of habitual residence.
“[A] child’s habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a ‘degree of settled purpose from the child’s perspective.’ ” Robert v. Tesson, 507 F.3d 981, 993 (6th Cir. 2007) (quoting Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995)). To determine whether a child has that sense of settled purpose in the new country, we examine various aspects of the child’s activities in that country, including social engagement and extracurricular programming. See Robert, 507 F.3d at 996 (quoting Karkkainen v. Kovalchuk, 445 F.3d 280, 293-94 (3d Cir. 2006)); Jenkins v. Jenkins, 569 F.3d 549, 556 (6th Cir. 2009) (quoting Robert, 507 F.3d at 996). Most importantly, because “academic activities are among the most central ... in a child’s life,” a child’s continued schooling in the new country is “highly suggestive of acclimatization.” Robert, 507 F.3d at 996 (internal quotation marks omitted) (quoting Karkkainen, 445 F.3d at 293).
This court’s habitual-residence analyses in Robert and Jenkins support the district court’s conclusion. In Robert, this court reasoned that a ten-month stay in one country with sustained schooling and family excursions sufficed to create a new habitual residence, but that a three-week stay in another country did not. Robert, 507 F.3d at 997. In Jenkins, this court reasoned that a six-month stay in a new country sufficed to create a new habitual residence, in light of continued schooling and other regular activities in the new country. Jenkins, 569 F.3d at 552-53, 556-57. Here, JSN and MKN attended school in Mexico and engaged in various extracurricular activities there, much as the children in Robert and Jenkins did in their habitual residences. Furthermore, JSN and MKN lived in Mexico for nearly four years—much longer than the ten months and the six months that sufficed to establish a hew habitual residence in Robert and Jenkins, respectively. JSN and MKN had settled into their lives in Mexico; Mexico *480 was their habitual residence in December 2014.
Ms. Neumann’s arguments to the contrary are unconvincing. She argues that the stay in Mexico was temporary, because the Neumanns maintained a home in Michigan during most of their stay in Mexico, and because they began looking for a new home in Michigan when they sold their old home in February 2014. But she herself has stated that they had plans to stay in Mexico until 2017, and that they did not have plans to go anywhere thereafter, intending to “cross that bridge when [they] came to it.” In any event, Ms. Neumann’s intentions per se are irrelevant; what matters is “the child’s perspective.” Robert, 507 F.3d at 993 (quoting Feder, 63 F.3d at 224). Furthermore, “habitual residence must not be confused with domicile,” which requires the intent permanently to remain. Friedrich v. Friedrich (Friedrich I), 983 F.2d 1396, 1401 (6th Cir. 1993). Unlike an inquiry into a child’s domicile, an inquiry into the child’s habitual residence “examinees] past experience, not future intentions.” Id. The past experience of JSN and MEN, in December 2014 and from their perspective, was nearly four years of continued schooling and socializing in Mexico, with no definite plans to live elsewhere.
Ms. Neumann also argues that the children’s • school in Mexico was an English-speaking international school and that their friends were not Mexican citizens. That is true, but that does not undermine the conclusion that the children’s academic and social lives had been, for nearly four years, in Mexico. Relatedly, she argues that the children maintained strong ties to Michigan throughout their four-year stay in Mexico. The children did frequently vacation in Michigan during school breaks and may have considered Michigan their home. But, in December 2014, for nearly four years they had attended school in Mexico, not Michigan, and they had based their social and extracurricular activities in Mexico, not Michigan. Even if Michigan was their home state, by December 2014, JSN and MEN had firmly settled into their new habitual residence in Mexico.
III.
Because Mexico was the country of habitual residence of JSN and MEN, and because the parties no longer dispute that Ms. Neumann violated Mr. Neumann’s custodial rights under Mexican law when she took her children to the United States on December 28, 2014, Ms. Neumann has wrongfully removed JSN and MEN under the Hague Abduction Convention. Hague Abduction Convention, art. 3. The district court therefore was bound to order Ms. Neumann to return the children back to Mexico, see id., art. 12, unless Ms. Neu-mann proved an affirmative defense. Ms. Neumann argues on appeal, as she argued below, that, by clear and convincing evidence, returning the children to Mexico would expose the children to a grave risk of physical or psychological harm or an otherwise intolerable situation.[1] The district court rejected that argument and ordered JSN and MEN back to Mexico. In *481 light of new developments, we do not decide whether the district court correctly decided, based on then-current circumstances, the close issue of whether returning the children to Mexico presented a grave risk of physical or psychological harm. The closeness of the issue, however, does make a remand more advisable.
The district court’s harm analysis depended on the circumstances in which thé children would have lived when they returned to Mexico. However, while the district court ordered the children to Mexico generally, the court did not order how the children would be returned, where they would temporarily live, and who would temporarily take care of them, pending the Mexican court’s custody determination. It is therefore uncertain what compliance with the district court’s order would have looked like.
“Grave risk” must be shown by clear and convincing evidence, 22 U.S.C. § 9003(e)(2), and it is a risk that is more than “serious,” but not necessarily “immediate.” Simcox, 511 F.3d at 605 (quoting Friedrich II, 78 F.3d at 1068). In Simcox, we held that the removing parent had met the burden of establishing a grave risk of harm, but commented that the issue was “close.” Simcox, 511 F.3d at 609. This case bears similarities to Simcox, but there are differences in both directions. In Simcox, the children “expressed fear of their father and recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears.” Id. at 599. But the father “downplay[ed] the seriousness of this ‘discipline.’” Id. Here, the children reported some physical abuse, but less frequent, less serious slaps on the head. The children also uniformly reported some verbal abuse; they say Mr. Neumann would often yell at them, for insignificant reasons or for no reason at all. In Simcox, the children also réported their father’s repeated abuse of their mother. According to them, the father called the mother a “f—ing bitch” and “a c—>” and the father on one occasion “put his finger on her neck, pulling hair.” Simcox, 511 F.3d at 599. Here, the children do not report a consistent abuse of Ms. Neumann, but they did witness the events of Christmas 2014, when they, say Mr. Neumann pulled a knife on Ms. Neumann, held the knife to her throat, and pushed her in a way that left Ms. Neumann with three broken ribs. JMN and JSN had to pull their father off their mother. In Simcox, the mother’s expert concluded that most of the children were generally suffering from “some level of post-traumatic stress disorder.” Simcox, 511 F.3d at 608. Here, Ms. Neumann’s expert also concluded that the children were suffering from PTSD, but the court-appointed expert did not diagnose PTSD and cautioned instead that the children continue to suffer psychological trauma from the incident that needs to be “professionally addressed.” Faced with the facts in Simcox, we held that there was “grave risk,” but we nevertheless indicated that returning the children might be appropriate if sufficient “undertakings” could be made to provide for their safe return. Simcox, 511 F.3d at 610-11.
It is a close issue whether, in light of Simcox, the district court correctly found that Ms. Neumann had failed to prove a grave risk of harm by clear and convincing evidence. On the one hand, the father’s physical abuse of the children was more serious and more frequent in Simcox than here. On the other hand, the severity of the Christmas 2014 incident exceeds the severity of any specific event in Simcox, and Mr. Neumann at the time of the district court’s order suffered from untreated and destabilizing alcoholism with a “clear risk of relapse,” which threatens “significant results” to the children.
*482 As in Simcox, see 511 F.3d at 604, the district court in this case privately interviewed the two young teenagers without counsel being present, and off the record. Such a procedure better enabled the district court to determine the true extent of the risk to them than the cold record that we face.
Because the circumstances of the return will no longer be as they were contemplated when the district judge ruled, and because a remand is required in any event as explained below, we do not resolve whether the district court properly found no clear and convincing evidence of physical or psychological harm at the time the court ordered the children’s return to Mexico. On remand, the district court may in its discretion take further evidence as to, for instance, whom the children will be staying with in Mexico during custody proceedings, and how Mr. Neumann has dealt with his alcoholism.
IV.
Because neither parent currently resides in Mexico, we face the independent question of whether there is a grave risk of an intolerable situation upon return to Mexico, arising from possible impediments to the ability of Mexican courts to adjudicate custody. In Pliego v. Hayes, 843 F.3d 226, 228-29 (6th Cir. 2016), we held that “where custody cannot be practically or legally adjudicated in the state of habitual residence,” there may be “ ‘grave risk’ that the child’s return would ‘place the child in an intolerable situation.’ ” Here,- if Ms. Neu-mann follows the district court’s order to return the children to Mexico without any specified logistical agreements, it may not be possible for custody to be practically or legally adjudicated in Mexico. The record does not show whether a Mexican court may exercise jurisdiction to resolve a custody dispute between two American parents over two of their three American children, all of whom are American citizens, none of whom are Mexican citizens, and none of whom reside in Mexico. In Pliego, we recognized that if diplomatic immunity prevented the state of habitual residence from adjudicating custody, that could be an intolerable situation under the Convention, in light of the underlying purpose of the Convention to have the state of habitual residence adjudicate custody. See Pliego, 843 F.3d at 233. In doing so, we also relied on foreign cases that reasoned that there was a grave risk of an intolerable situation where, for instance, a parent could not legally travel to the country that would have determined custody, id. at 234 (citing Chan v. Chow, 199 Dominion Law Reports 4th 478, paras. 59, 65-66 (Court of Appeals for British Columbia, Canada, 2001)), or the parent could not legally represent his or her interest and the child’s interest in the subsequent litigation, id. (citing State Central Authority of Victoria v. Ardito, (unreported, Family Court of Australia, Joske, J., 29 Oct. 1997)). Similarly, if Mexico as a practical or legal matter cannot or will not adjudicate custody, the intolerable situation exception to the obligation to return may apply. The issue is presented by the intervening change of facts, and should be addressed by the district court in the first instance.
It cannot successfully be argued in response that the exception for grave risk is necessarily determined at the time of the return order rather than at the time of the actual return, when there is appreciable distance between the two. The official commentary to the Hague Abduction Convention explains that the grave-risk exception “clearly derivefs] from a consideration of the interests of the child” and concludes: “the interest of the child in not being removed from its habitual residence ... gives way before the primary interest of *483 any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.” Elisa Perez-Vera, Explanatory Report ¶ 29, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 1069 (1982)[2]; see also Simcox v. Simcox, 511 F.3d 594, 604 n.3 (6th Cir. 2007) (explaining that the report is the official commentary). That primary interest in protecting the child from danger or an intolerable situation can only be served if courts consider the dangers that the child will actually face upon return, as opposed to some counterfactual dangers that the child would have faced if he had been returned beforehand.
When, as here, material facts underlying the district court’s judgment have changed during the appeal, appellate courts have remanded the case to the district court for further proceedings. In McLeod v. General Electricity Co., 385 U.S. 533, 535, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967), the Supreme Court determined, when parties to a labor dispute reached a collective bargaining agreement after the opinions of the district court and the court of appeals, that the “District Court should determine in the first instance the effect of this supervening event upon the appropriateness of injunctive relief.” In City of Pontiac Retired Employees Ass’n v. Schimmel, 751 F.3d 427 (6th Cir. 2014) (en banc) (per curiam), we, too, have similarly sent back a case to the district court with a general remand, explaining that “[ljegal, factual, and equitable considerations ha[d] developed significantly since the district court denied the plaintiffs’ request for a preliminary injunction almost two years ago,” id. at 428, where the plaintiffs were challenging an emergency manager’s elimination of the health benefits of the retired employees of a money-strapped city, but during appeal, the state had stripped the emergency manager of the power to do so, only to give that power back, and the emergency manager had issued another order eliminating the health benefits in the same way, id. at 429-30. Other circuits have similarly remanded district court orders for further consideration in light of intervening changes to material facts. See Gen. Elec. Co. v. Local Union 191, 443 F.2d 608, 610 (5th Cir. 1971); Firestone Synthetic Rubber & Latex Co. v. Potter, 400 F.2d 897, 898 (5th Cir. 1968); Korn v. Franchard Corp., 456 F.2d 1206, 1208 (2d Cir. 1972).
Of course when appellate courts remand an appeal from a decision ordering injunc-tive relief, there is the danger that ever-changing factual predicates may result in an endless series of appeals and remands. See generally Stuart Benjamin, Stepping into the Same River Twice: Rapidly Changing Facts and the Appellate Process, 78 Tex. L. Rev. 269 (1999). Such a concern is outweighed in this case, however. First, as explained above, the right to relief is tied closely by the applicable law to the factual situation at the time the order is complied with. Second, the factual change goes to the core reason for relief: adjudication of custody by the state of habitual residence.
Third, the time for changes in circumstances to occur was extended in this case by the grant of a stay pending appeal. The Hague Abduction Convention declares its object to be to arrange a “prompt” return of wrongfully removed children. Hague Abduction Convention, art. 1. That purpose has been frustrated to some extent in this case by the appellate stay. The district court entered its order on May 16, 2016, to return the two younger children to Mexico. Ms. Neumann sought a stay of that order, *484 which the district court set for hearing and which the court rejected on June 29, 2016. Because of the stay motion below, and the emergency stay motion here, the district court stayed the return for another month—'Until July 27, 2016. See Neumann v. Neumann, 197 F.Supp.3d 977, 979-80 (E.D. Mich. 2016). While this court expedited its review of this case, on July 15, 2016, Ms. Neumann filed an emergency motion to stay the reten order. On July 22, 2016, a panel of this court issued a stay pending appeal. We heard oral argument on December 1, 2016. It is now more than half a year since the children would have been returned in the absence of our stay. In many cases that would not be enough time for circumstances to change appreciably, but certainly they did in this case.
V.
We uphold the district court’s holdings that Mexico was the country of habitual residence of JSN and MKN, and that Ms. Neumann violated Mr. Neumann’s custodial rights under Mexican law when she took her children to the United States on December 28, 2014. Our remand is otherwise general. The district court should determine whether or not clear and convincing evidence shows that returning the children now presents a “grave risk” of “physical or psychological harm” or “an intolerable situation.” If so, then the district court has discretion to deny return, or to grant return subject to undertakings that'would substantially lessen the risk. See Simcox v. Simcox, 511 F.3d 594, 604-11 (6th Cir. 2007). If the court determines that there is not a sufficient showing of a grave risk, the court should order return.
Should the district court decide that a return order is indeed required, such a return order should provide sufficient practical detail so that return can be accomplished promptly without further appreciable litigation delay. We explained in Simcox that even if the district court finds no affirmative defense to the return order, that court may still “deal with ordinary logistical considerations that frequently accompany the return of any child.” Id. at 607 n.5. “It has long been understood that ‘[cjertain implied powers must necessarily result to our Courts of justice from the nature of their institution,’ powers ‘which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.’” Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (alteration in original) (quoting United States v. Hudson, 11 U.S. 32, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)).
The district court’s return order is vacated, and the case is remanded for further proceedings consistent with this opinion.

. Contrary to Mr. Neumann's arguments, Ms. Neumann has not forfeited this affirmative defense. Even though Ms. Neumann did not plead this affirmative defense in her answer to Mr. Neumann’s complaint, the "failure to raise an affirmative defense by responsive pleading does not always result in waiver." Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993). It does not result in waiver "if a plaintiff receives notice of an affirmative defense by some means other than pleadings.” Id. (quoting Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989)). Here, not only did Mr. Neumann receive notice of this affirmative defense, but he also briefed the issue at the district court, following Ms. Neumann’s briefing on the issue.

. Available at https://assets.hcch.neJ/upload/ expl28.pdf.