RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

PIERRE SALAME AJAMI,

*Petitioner-Appellee*,

*v.*

VERONICA TESCARI SOLANO,

*Respondent-Appellant*.

┐
│
│
│
│
├ No. 20-5283
│
│
│
│
┘

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-00161—Eli J. Richardson, District Judge.

Argued: October 27, 2021

Decided and Filed: March 29, 2022

Before: GUY, MOORE, GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Lyndsay A. Gorton, CROWELL & MORING LLP, Washington, D.C., for Appellant. Ashley Goins Alderson, STITES & HARBISON PLLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Scott L. Winkelman, Rebecca Baden Chaney, CROWELL & MORING LLP, Washington, D.C., for Appellant. Ashley Goins Alderson, Rebecca McKelvey Castañeda, STITES & HARBISON PLLC, Nashville, Tennessee, for Appellee.

GIBBONS, J., delivered the opinion of the court in which GUY, J., joined. MOORE, J. (pp. 13–21), delivered a separate dissenting opinion.

―――――――――――

**OPINION**

―――――――――――

JULIA SMITH GIBBONS, Circuit Judge.  Pierre Salame Ajami ("Salame") petitioned for the return of his two minor children under the Hague Convention on Civil Aspects of International Abduction.  The children were removed from Venezuela, their country of habitual residence, to the United States by their mother, Veronica Tescari Solano ("Tescari").  The district court granted Salame's petition and ordered the children be returned to Venezuela.  We affirm.

**I.**

Tescari and Salame are Venezuelan citizens and have two minor children together, EAST and PGST.  In 2018, Tescari removed the children from their home in Barquisimeto, Venezuela, and brought them with her to the United States.  Salame filed a petition under the Hague Convention seeking the children's return on February 20, 2019.  Tescari and, as derivative family members, the children were granted asylum in the United States on June 10, 2019.  The district court held a bench trial on Salame's petition on July 30, July 31, August 6, and December 6, 2019.

> The parties stipulated to the applicability of the Convention and to the following facts:
>
> (1) EAST and PGST are under the age of sixteen; (2) EAST and PGST's habitual residence is Venezuela for the purposes of the Convention; (3) Petitioner had rights of custody, as contemplated by the Convention, under Venezuelan law at the time the Children were removed from Venezuela; (4) Petitioner was exercising rights of custody with respect to the minor Children at the time Respondent removed them from Venezuela; (5) Pursuant to the Hague Convention, Respondent wrongfully removed the Children from Venezuela and their retention in the United States is wrongful under Venezuelan law; and (6) Petitioner filed his Petition for Return on February 20, 2019, which is within one year of the Children's removal from Venezuela.

*Ajami v. Solano*, No. 3:19-cv-00161, 2020 WL 996813, at *3 (M.D. Tenn. Feb. 28, 2020).  This stipulation established Salame's prima facie case of wrongful removal, so the only issue before the district court was whether Tescari established an affirmative defense under Article 13(b) of

the Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11,670. *See* 22 U.S.C. § 9003(e)(2); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996).

The district court concluded Tescari failed to establish, by clear and convincing evidence, her affirmative defense that returning the children to Venezuela would subject them to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation. It therefore granted Salame's petition and ordered that the children be returned to Venezuela.

## II.

In 1988, the United States ratified the Hague Convention, which Congress implemented through the International Child Abduction Remedies Act, 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.* The Convention attempts "[t]o address 'the problem of international child abductions during domestic disputes.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (citation omitted). "It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (alteration in original) (citation omitted). Generally, the Convention requires the prompt return of children wrongfully removed from their country of habitual residence. *Id.* But certain exceptions apply. A court "is not bound to order the return of the child[ren] if . . . there is a grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Convention, art. 13(b). The party seeking to avoid removal must demonstrate this exception applies "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

In cases involving a petition under the Hague Convention for return of children, we review the district court's findings of fact for clear error. *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007). We review de novo the district court's application of the Convention to the facts and its conclusions about American, foreign, and international law. *Id.* Whether a child would be exposed to a "grave risk" of harm or returned to an "intolerable situation" are mixed questions of law and fact that we also review de novo. *Id.*; *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir.

2001) ("The District Court's *application* of the Convention to the facts it has found, like the *interpretation* of the Convention, is subject to de novo review.").

We affirm the district court's conclusion that Tescari failed to present clear and convincing evidence that an Article 13(b) exception applies. She failed to demonstrate that returning the children to Venezuela would expose them to a grave risk of physical or psychological harm or otherwise subject them to an intolerable situation. On appeal, Tescari argues the district court's conclusion was error because the children's father is physically and verbally abusive; Venezuela is a zone of war and famine; and the Venezuelan court system is unable to adjudicate the parties' custody dispute. She further claims the district court failed to properly consider her and the children's grant of asylum. We address each of her claims in turn.

**A.**

Tescari claims that returning the children to Venezuela would expose them to a grave risk of harm due to Salame's alleged history of domestic violence. In a Hague Convention case, our precedent establishes three broad categories of abuse: minor, clearly grave, and cases in the middle, in which the abuse "is substantially more than minor, but is less obviously intolerable." *Simcox*, 511 F.3d at 607−08. A case involving relatively minor abuse would likely not pose a grave risk to the child nor place the child in an intolerable situation. *See id.* at 607. In such cases, the district court has no discretion to refuse the petition to return because the Article 13(b) threshold has not been met. *Id*. A case in which the abuse is clearly grave typically involves "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id*. at 607−08. Cases in the middle category call for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608.

First, Tescari contends the district court erred in finding that the claimed abuse towards her, which was allegedly witnessed by the children, falls into the category of minor abuse. Tescari claims that Salame physically abused her by dragging her through the house by her hair, resulting in three bruises, and verbally abused her by telling her she can hang herself. She also

argues the district court failed to consider the "entire mosaic" of the parties' relationship and thus erred in finding that there was no pattern of violent and abusive behavior.  CA6 R. 42, Appellant Amended Br., at 37−38.  The district court found that Tescari established one incident of physical abuse by Salame towards her in 2013, although it did not conclusively determine what happened.  *See Ajami*, 2020 WL 996813, at *8 ("Although the Court finds that something happened between [Salame] and [Tescari] on one occasion in 2013, [Tescari's] vague reference to other incidents of violence is insufficient to establish that these additional incidents of abuse occurred.").  It also determined that the parties "have a tumultuous relationship that negatively affects EAST and PGST."  *Id*. at *7.  Over the course of its multiday trial, the district court heard testimony and considered evidence from both parties, and it was unable to find that Salame ever abused the children.   The district court made credibility determinations, and its factual conclusions regarding Tescari's allegations of abuse are not clearly erroneous.

For comparison, in *Simcox*, the petitioner repeatedly beat his children by hair pulling, ear pulling, and belt whipping.  511 F.3d at 599.  He also banged the respondent's head on the window of a car in which they were travelling and struck her in front of the children.  *Id.*  There, we held that the abuse fell into the middle category because it was "somewhat less serious than the abuse in which other courts have refused to order return … [b]ut [was] also decidedly *more* serious than the abuse in those cases . . . in which courts have declined to find a 'grave risk' of harm."  *Id.* at 609.  Here, the district court found one credible incident of abuse.  This incident— even when considered alongside the other alleged and unproven conduct—is clearly less serious and less frequent than the middle-level abuse detailed in *Simcox*.  We agree with the district court's conclusion that the one incident of abuse falls into the relatively minor category, and we echo its comment that calling such abuse "relatively minor" does not mean we find any type, level, or frequency of abuse acceptable.  Rather, the abuse does not rise to the level of a viable defense to the children's return under Article 13(b).

Second, Tescari claims the district court erred because "an order of return must be supported by evidence of no potential *future* harm to the Children."  CA6 R. 42, Appellant Amended Br., at 39.  But this is only a relevant inquiry once the Article 13(b) threshold has been met and the case involves clearly grave abuse.  *Simcox*, 511 F.3d at 608 (explaining the court

should refuse to grant a petition of return in cases where the abuse falls into the clearly grave category "unless 'the rendering court [can] satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody'" (quoting *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005))).  Because the abuse in this case is relatively minor, the district court had no discretion to refuse the petition nor to consider evidence of potential future harm.

**B.**

Tescari claims the district court "erred in finding that the children do not face a grave risk of physical or psychological harm from a return to Venezuela, a zone of war and famine"; thereby placing herself and the children in an intolerable situation.  CA6 R. 42, Appellant Amended Br., at 22.  The difference between exposing a child to a "grave risk of harm" and subjecting a child to an "intolerable situation" is not clearly established in our court's precedent.  But an "'intolerable situation' must be different from 'physical or psychological harm,' but nevertheless serious," meaning "either it cannot be borne or endured, or it fails some minimum standard of acceptability."  *Pliego v. Hayes*, 843 F.3d 226, 233 (6th Cir. 2016).  An "intolerable situation" can arise when the state of habitual residence is experiencing civil instability.  *See id.* at 232−33.  Similarly, a grave risk of harm exists when "return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease."  *Friedrich*, 78 F.3d at 1069.  But an intolerable situation does not arise merely when the child would be returned to a country "where money is in short supply, or where educational or other opportunities are more limited than in the requested State."  *Id.* at 1068−69.  Whether reviewed for grave risk of harm or intolerable situation, this is an inquiry that evaluates both Venezuela's overall dangerousness and the particular circumstances the children would face if returned to Venezuela.  *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002); *see also Pliego*, 843 F.3d at 232 (citing *id.* at 1364−65).

First, we note the lack of precedent identifying any country as a zone of war sufficient to trigger the grave risk or intolerable situation exception.[1]  In *Silverman v. Silverman*, the Eighth

---

[1]Neither the district court nor the parties cite any cases to the contrary.

Circuit overturned the district court's conclusion that violence in Israel "constitute[d] a 'zone of war,' warranting application of the 'grave risk' exception."  338 F.3d 886, 900 (8th Cir. 2003). It based its decision, in part, on the fact that schools and businesses were open, the general regional violence threatened everyone in Israel, and it was not putting the children in any more specific danger than when their mother voluntarily moved them there.  *Id.*

Turning to Venezuela, a district court in Massachusetts noted that the conditions in the country are "analogous to countries experiencing war, famine, or disease, such as Syria, Somalia, Afghanistan, and Iraq," however it did not need to determine whether the child would face a grave risk of harm if returned to Venezuela because the child had reached a degree of maturity for his preference to be considered.  *Avendano v. Balza*, 442 F. Supp. 3d 417, 431 (D. Mass. Feb. 25, 2020), *aff'd*, 985 F.3d 8 (1st Cir. 2021).  On the other hand, a district court in Florida recently considered Venezuela's food and medicine shortages and violent protests, and it held these conditions do not rise to the level of a zone of war, famine, or disease.  *Crespo Rivero v. Carolina Godoy*, No. 18-cv-23087, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018).  We also note that Venezuela is not actively torn by civil war—it remains a single integrated country capable of signing international treaties.  As such, it remains a fellow signatory to the Hague Convention.

Here, the parties presented evidence of the humanitarian and political crises unfolding in Venezuela and evidence of the particular circumstances the children would face if returned. Admissible evidence included testimony regarding the frequent protests in Barquisimeto, an incident of criminal violence against the family in their home approximately ten years ago, and shortages of gas, water, food, electricity, and medication.  But the district court also received evidence that the protests are avoidable by not traveling on certain streets, the grocery store near Salame's home is stocked with food and water, Salame's home is equipped with a generator, the family has access to medical care and medication, and the children will return to their school and soccer teams.  Ultimately, Tescari and Salame paint very different pictures of family life in the children's home country.  Considering both parties' evidence, the district court determined Salame could provide the children with shelter, food, and medication in Venezuela.  This factual finding is not clearly erroneous.

We recognize that Venezuela has been suffering from years-long, well-documented political and socioeconomic crisis, characterized by economic instability, power outages, food and medicine shortages, and violent protests. But we must base our decision on the record evidence, and we are required to consider the particular circumstances to which the children are returning. EAST and PGST are being returned to a home with adequate shelter, food, water, and medical care. Although the conditions in Venezuela are less stable than those the children likely enjoyed in Murfreesboro, Tennessee, this does not mean they would face an intolerable situation or a grave risk of harm upon return. Despite Venezuela's political schisms and civil unrest, Tescari failed to introduce sufficient evidence that it is a zone of war, famine, or disease warranting an Article 13(b) affirmative defense.

**C.**

Tescari argues the district court erred by concluding that the Venezuelan court system can adjudicate the parties' custody dispute. She claims her custody dispute cannot be adjudicated in her children's home country because she "cannot travel to Venezuela to participate in custody proceedings, nor will the Venezuelan court system meaningfully adjudicate custody," and this constitutes an intolerable situation. CA6 R. 42, Appellant Amended Br., at 30. In *Pliego*, we held that an "intolerable situation" can "encompass situations where the courts of the state of habitual residence are practically or legally unable to adjudicate custody." 843 F.3d at 232. Whether an intolerable situation exists is a mixed question of fact and law we review de novo, but the district court's underlying factual determination that Venezuelan courts can adjudicate custody is reviewed for clear error. *See id.* ("[E]ven though a showing that Turkish courts could not properly adjudicate custody in this case could amount to an intolerable situation, the district court did not clearly err as a matter of fact in finding that Turkish courts could adjudicate custody.").

Tescari does not argue she is legally unable to adjudicate custody in Venezuela. Rather, she claims that she cannot participate in custody proceedings there because she "cannot travel to Venezuela without a grave risk of harm to herself." CA6 R. 42, Appellant Amended Br., at 30. She argues that because she was granted political asylum in the United States, allegedly due to her fear of the Maduro regime, she cannot return to adjudicate custody as it would place her in an

intolerable situation or subject her to a grave risk of harm.  Notably, this is not an argument she raised in the district court proceedings.  Generally, we "decline to entertain arguments not presented in the first instance to the trial court." *Brown v. Crowe*, 963 F.2d 895, 897 (6th Cir. 1992).  Although Tescari's claim of fear may be relevant to her ability to adjudicate custody in Venezuela, this is a matter of first impression on appeal, and we decline to consider it.

Tescari next argues that the district court erred in concluding that she failed to prove the corruption of the Venezuelan courts and the undue influence of Salame.  Tescari points to testimony about general corruption in the Venezuelan judiciary, testimony about persecution of political opposition leaders, and her attorney's testimony about proceedings being biased in favor of Salame due to his political connections.  However, there was also evidence that Tescari's attorney has been able to file documents, review case files, and even secured a new judge to oversee the parties' custody dispute after requesting recusal of the previous judge.  Ultimately, the district court found that delays in court proceedings among the parties and other examples of purported corruption "are not so severe as to indicate the Venezuelan courts are corrupt or that they would be unable to fairly adjudicate the custody dispute." *Ajami*, 2020 WL 996813, at \*19.  This factual finding is not clearly erroneous, and any defects in the Venezuelan court system fall short of what is required for an intolerable situation.  *Pliego*, 843 F.3d at 235.

**D.**

Lastly, Tescari argues the district court failed to properly consider her grant of asylum, thereby "threaten[ing] the sovereignty of the executive branch."  CA6 R. 42, Appellant Amended Br., at 43.  She claims the district court's order effectuating return, despite the children's asylee status, usurps Congress's authority and renders null the executive branch's asylum determination.  (*Id*. at 25.)  We find Tescari's argument without merit because the district court has the authority to order the return of wrongfully removed children, regardless of whether the children were previously granted asylum.

The Fifth Circuit considered a similar question in *Sanchez v. R.G.L.*, 761 F.3d 495 (5th Cir. 2014).  In *Sanchez*, three children sought reversal of the district court's finding under the Convention that they should be returned to their mother in Mexico.  *Id*. at 499.  While their

appeal was pending, the children were granted asylum in the United States pursuant to 8 U.S.C. § 1158, which states "the Attorney General … shall not remove or return the alien to the alien's country of nationality." *Id.* at 501−02. This grant of asylum is discretionary and requires that the recipient have suffered past persecution or demonstrate a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A), *incorporated by* 8 U.S.C. § 1158(b)(1)(B)(i). On appeal, the children argued that the grant of asylum superseded the district court's order. *Sanchez*, 761 F.3d at 509.

The Fifth Circuit rejected this argument, refusing to hold that the grant of asylum must be revoked before the children could be returned to Mexico. *Id.* at 510. The court held that "[t]he language of the INA indicates that the discretionary grant of asylum is binding on the Attorney General or Secretary of Homeland Security." *Id.* However, no authority was offered "that the discretionary grant of asylum confers a right to remain in the country despite judicial orders under this Convention." *Id.* Moreover, "[t]he asylum grant does not supercede the enforceability of a district court's order that the children should be returned to their mother, as that order does not affect the responsibilities of either the Attorney General or Secretary of Homeland Security under the INA." *Id.* The court recognized that the factors relevant to an asylum grant may also be "relevant to whether the Hague Convention exceptions to return should apply." *Id.* But *Sanchez* did not hold that the fact asylum was granted, in and of itself, is a basis for remand. *Id.* Rather, it was the newly available evidence associated with the asylum proceedings that the Fifth Circuit remanded for the district court to consider. Further, "[d]espite similarities, the asylum finding that the children have a well-founded fear of persecution does not substitute for or control a finding under Article 13(b) of the Convention about whether return 'would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" *Id.* (citation omitted).

The case before us is slightly different in that Tescari and, derivatively, the children were granted asylum *before* the district court ordered return of the children. But, as in *Sanchez*, she and the children were granted asylum under 8 U.S.C. § 1158, and we adopt the Fifth Circuit's reasoning here. "The judicial procedures under the Convention do not give to others, even a

governmental agency, authority to determine [the] risks" children may face upon return to their country of habitual residence. *Sanchez*, 761 F.3d at 510. Thus, "an asylum grant does not remove from the district court the authority to make controlling findings on the potential harm to the child." *Id.* The district court made independent findings on whether the children would face an intolerable situation or a grave risk of harm in Venezuela, considering all offered, admissible, and relevant evidence. "The prior consideration of similar concerns in a different forum" may be relevant, but a grant of asylum does not strip the district court of its authority to make controlling findings regarding circumstances the children may face upon return. *Id*.

We also note the difference in evidentiary burdens between asylum proceedings and those under the Convention's framework. To be granted asylum, eligibility must be shown by a preponderance of the evidence. *See* 8 C.F.R. § 1208.13(a), (b)(1)(i). But for an Article 13(b) affirmative defense to apply, the respondent must establish the exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2). Additionally, the opportunity for participation by interested parties may be different—here, Salame did not participate in the asylum proceedings.

Although the Fifth Circuit vacated the district court's return order and remanded the matter to the district court to consider the newly "available evidence from the asylum proceedings," we do not find remand necessary here. *Sanchez*, 761 F.3d at 511. Here, the district court did not explicitly mention the grant of asylum in its Order. But the grant of asylum was discussed at trial, and the district court admitted into evidence Tescari's "Asylum Approval" document.[2] Tescari had the opportunity to present evidence from the asylum proceedings, which may have also been relevant to the instant proceedings, to the district court but failed to do so. Now, on appeal, she fails to point to any evidence that would have been elicited from the asylum proceedings that the district court failed to cover over the course of the four-day trial. Her argument rests solely on the district court's lack of a discussion of the effect of the grant of asylum itself in its Order. But a grant of asylum does not substitute for the district court's determination that Tescari failed to establish an Article 13(b) affirmative defense based on grave

---

[2]On appeal, Salame claims we may not rely on this document, marked D-20 at trial, because it was not admitted into evidence. Although Salame's attorney objected to D-20 when it was shown to Tescari at trial, she withdrew her objection the next day. The updated exhibit list also indicates that D-20 was admitted.

risk of harm or intolerable situation. Nor does it substitute for our own de novo finding of the same.

While the factors that go into a grant of asylum may be relevant to determinations under the Hague Convention,[3] the district court has a separate and exclusive responsibility to assess the applicability of an Article 13(b) affirmative defense. We reject Tescari's argument that a grant of asylum deprives federal courts of authority to enforce the Hague Convention.

## III.

We affirm the district court's order that EAST and PGST be returned to their habitual residence in Venezuela.

---

[3]We do not hold that a district court need not consider a grant of asylum at all. Rather, under these circumstances, in which Tescari had the opportunity to present evidence related to her asylum to the district court and fails to point to any evidence from the asylum proceedings that may also have been relevant to the Article 13(b) analysis, remand is not necessary for the district court to mention the piece of paper itself. The effects of the asylum grant may be relevant to the Article 13(b) analysis, but Tescari's argument on appeal is that the district court's failure to examine her asylum grant "threatens the sovereignty of the executive branch." CA6 R. 42, Appellant Amended Br., at 43. This argument is without merit and irrelevant to the Article 13(b) analysis. Insofar as Tescari argues the grant of asylum affects her other claims, these issues were not raised in the district court and, as discussed above, we decline to consider them.

———————————————

**DISSENT**

———————————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The Hague Convention governs proceedings when children are wrongfully removed from their country. But other international and domestic human rights obligations provide special protections for refugees. Although grants of asylum do not control the outcome of a proceeding under the Hague Convention, they do inform the Hague Convention's application, and a district court abuses its discretion when it declines even to consider them. I respectfully dissent.

**A. Statutory and International Law Background**

Before turning to the specifics of this case, I start by discussing the mandates imposed by the Hague Convention and international and domestic asylum law. The Hague Convention on the Civil Aspects of International Child Abduction has the dual purposes of "secur[ing] the prompt return of children wrongfully removed to or retained in any Contracting State" and "ensur[ing] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague Convention"). Wrongful removals and retentions are those that are "in breach of rights of custody . . . under the law of the State in which the child was habitually resident immediately before the removal or retention" if "those rights were actually exercised . . . or would have been so exercised but for the removal or retention." *Id.* art. 3.

The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, implements the Hague Convention. ICARA provides that parents may petition a federal or state court to return children who have been wrongfully removed, *id.* § 9003(b), and the petitioner must show by a preponderance of evidence "that the child has been wrongfully removed or retained within the meaning of the Convention," *id.* § 9003(e)(1)(A). "[A] court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996).

The Hague Convention establishes various affirmative defenses for respondents who oppose children's return. Two are relevant to this case. The first, found in Article 13(b), applies when "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The second, found in Article 20, is operative when "[t]he return of the child . . . would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." A respondent must establish these defenses by clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

Although these exceptions are "narrow," they are not insignificant. 22 U.S.C. § 9001(a)(4). This court has previously cautioned against "making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the most egregious cases." *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007). These affirmative defenses are important because "the Convention's mandate of return gives way before the primary interest of any person in not being exposed to physical or psychological danger." *Id.* at 609 (internal quotation omitted).

The affirmative defenses are implicated when a family has received asylum. To qualify for asylum, a person must have been persecuted or have "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42), incorporated by 8 U.S.C. § 1158(b)(1)(B)(i). "In the case of an alien granted asylum," as is the case with Tescari and her children, "the Attorney General . . . shall not remove or return the alien to the alien's country of nationality." *Id.* § 1158(c)(1)(A).

Recognizing the overlap between the Hague Convention's affirmative defenses and the asylum inquiry, the Fifth Circuit held in *Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014), that "[t]he children's asylum grant . . . is relevant to whether the Hague Convention exceptions to return should apply." The Fifth Circuit recognized that "[t]he district court makes an independent finding of potential harm to the children," in part because "the evidentiary burdens in the asylum proceedings and those under ICARA's framework are different." *Id.* Nonetheless, it concluded that "grants of asylum are relevant to any analysis of whether the Article 13(b) or 20 exception applies." *Id.* at 511. The Fifth Circuit remanded the case to the district court "to

consider the asylum grants, assessments, and any related evidence not previously considered that relates to whether Article 13(b) or 20 applies."[1]   *Id.*   In short, although the Fifth Circuit acknowledged that an asylum grant does not control the outcome of a case brought pursuant to the Hague Convention, the asylum grant is relevant, and the district court should consider it.

At least one court outside of the United States has considered the interplay between asylum and the Hague Convention.  In *A.M.R.I. v. K.E.R.*, [2011] O.N.C.A. 417 (Can. Ont. C.A.), the Court of Appeals for Ontario that held that the Hague Convention did not require the return of a child who had been granted refugee status.  The Canadian court explained:

> [T]he principle of non-refoulement is directly implicated where the return of a refugee child under the Hague Convention is sought.  Nothing in the [Immigration and Refugee Protection Act (IRPA)] purports to exempt child refugees from the application of s. 115 in a Hague Convention case.  Nor does the Hague Convention purport to elevate its mandatory return policy above the principle of non-refoulement.
>
> In our view, properly interpreted, the Hague Convention contemplates respect for and fulfillment of Canada's non-refoulement obligations.  Specifically, art. 13(b) of the Hague Convention permits the refusal of an order of return concerning a child, who would otherwise be automatically returnable under art. 12, if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  In addition, art. 20 provides for the denial of an order of return if it would not be permitted "by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  In accordance with the interpretive principles set out above, arts. 13(b) and 20 must be construed in a manner that takes account of the principle of non-refoulement.

[2011] O.N.C.A. 417 ¶¶ 67–68.  The court further explained that "[u]nder both s. 115 of the IRPA and its international human rights obligations, Canada is prohibited from engaging in the refoulement of Convention refugees, including refugee children."  *Id.* ¶ 71.  "Consequently, the exception to return under art. 20 is engaged in cases involving refugee children."  *Id.*  Likewise, "when a child has been recognized as a Convention refugee by the [Immigration and Refugee Board], a rebuttable presumption arises that there is a risk of persecution on return of the child,"

---

[1]After the Fifth Circuit's decision, the mother withdrew her request for the children's return, so the district court never considered this issue.  *Sanchez v. Sanchez*, No. SA-12-CA-568-XR, 2015 WL 3448009, at *6 (W.D. Tex. May 27, 2015).

which "clearly implicates the type of harm contemplated by art. 13(b) of the Hague Convention." *Id.* ¶ 74.

The Canadian court's opinion is "entitled to considerable weight" because it comes from a "sister signatory." *Abbott v. Abbott*, 560 U.S. 1, 12 (2010) (quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tesng*, 525 U.S. 155, 176 (1999)). "The principle applies with special force here, for Congress has directed that 'uniform international interpretation of the Convention' is part of the Convention's framework." *Id.* (quoting 42 U.S.C. §§ 11601(b)(3)(B), now codified at 22 U.S.C. § 9001(b)(3)(B)).

To summarize: the Hague Convention generally favors the return of children, but its affirmative defenses create exceptions. As both domestic and international courts have recognized, those defenses are implicated when a party has received asylum. With this as background, I turn to Article 13(b), Article 20, and their application in this case.

**B. Article 13(b)**

First, the asylum grants implicate the court's analysis under Article 13(b). This provision creates an affirmative defense to the Hague Convention's requirements when "there is a grave risk that [the child's] return would expose the child to physical harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The "intolerable-situation" exception in Article 13(b) is "different from 'physical or psychological harm,' but nevertheless serious." *Pliego v. Hayes*, 843 F.3d 226, 233 (6th Cir. 2016). An intolerable situation either "cannot be borne or endured, or it fails some minimum standard of acceptability." *Id.* In a case such as this, in which a parent is granted asylum and children are granted derivative asylum, the "grave risk of harm" exception is not implicated, but the "intolerable situation" exception is.

The intolerable-situation exception "can encompass situations where the courts of the state of habitual residence are practically or legally unable to adjudicate custody." *Pliego*, 843 F.3d at 232. This exception is highly relevant in a case such as this, in which a parent has received asylum. In *Pliego*, we looked to decisions by foreign courts that held that the exception applied when a parent was unable to return to the country to which the other parent sought to have the child returned. *Id.* at 234–35 (collecting cases); *see Neumann v. Neumann*, 684 F.

App'x 471, 482 (6th Cir. 2017).  For example, Australian courts have looked to whether a parent is able to get a visa to return to the country where the custody proceedings would have taken place.  *See State Cent. Auth. of Victoria v. Ardito* (Unreported, Family Court of Australia, Joske J, 29 October 1997) ¶ 50 (Austl.) ("[T]he fact that the respondent is unable to gain entry into the United States for the purpose of appearing in these proceedings, amounts to what can only be described as a serious denial of natural justice. . . . Accordingly, I am of the opinion that the fact that the respondent is denied entry into the United States constitutes a grave, or in this case an almost certain risk, that the child Y will be placed in an intolerable situation.").  A Canadian court has similarly suggested that a situation may be intolerable when a parent is unable to leave the country to participate in custody proceedings in other countries.  *See Chan v. Chow,* [2001] 199 D.L.R. 4th 478, ¶¶ 65–66 (Can. B.C.C.A.).

The district court did not analyze whether Tescari can return to Venezuela.  It did not consider the grant of asylum.[2]  The district court evaluated the children's living situation whether Tescari "chooses to return to Venezuela with the Children" or "chooses not to return to Venezuela with the Children."  *Ajami v. Solano*, No. 3:19-cv-00161, 2020 WL 996813, at \*9 (M.D. Tenn. Feb. 28, 2020).  It also analyzed whether corruption in the Venezuelan courts rendered them unable to adjudicate the custody dispute.  *Id.* at \*18–20.  However, it never considered Tescari's grant of asylum in either of these discussions.  Nor did it make an independent assessment of whether Tescari would be able to return to Venezuela, let alone whether she would be able to do so in light of her asylum status.[3]

This oversight is significant.  Even apart from the risks that an asylee faces in their home country, an asylum grant impacts that person's ability to return.  Individuals who are granted asylum in the United States may be unable to return to their home country without facing a substantial risk that their asylum will be revoked.  *See* U.S. Citizen & Immigration Servs., Policy

---

[2]The district court opinion discusses asylum only in the context of Salame's testimony that he did not give permission for Tescari to travel abroad with the children because he believed Tescari was planning to seek asylum in the United States.  2020 WL 996813, at \*2, 5.

[3]The majority incorrectly implies that, on appeal, Tescari's asylum argument is wholly disconnected from her Article 13(b) analysis.  Maj. Op. at 12 n.3.  However, Tescari's brief explicitly links her asylum grant, her inability to return to Venezuela, and Article 13(b). Appellant Br. at 30–31.

Manual, Chapter 6 – Termination of Status and Notice to Appear Considerations, (A)(1), https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-6.

Children are placed in an intolerable situation when their parent is forced to choose between the risk that the parent will lose their asylum status in the United States and the risk that the parent will lose custody of the children if the parent fails to return to the country in which custody will be adjudicated. Although Tescari's attorney has continued to litigate on her behalf in Venezuelan courts despite her absence, *see, e.g.*, R. 101 (Tr. at 46) (Page ID #2658), it is unclear how effective these efforts can be. At the very least, the situation that the family in this case confronts is akin to a situation in which a parent cannot return the country of residence—a situation that our court has recognized as intolerable in *Pliego*, and that other signatories have likewise recognized as intolerable.

The intolerableness of this situation is further heightened in the asylum context because a child's parent must choose between living in the same country as the child and avoiding the parent's own well-founded fear of persecution. "[T]he Convention's mandate of return gives way before the primary interest of any person in not being exposed to physical or psychological danger[.]" *Simcox*, 511 F.3d at 609 (citations and internal quotation marks omitted)). It cannot be the case that the Hague Convention was intended to require the removal of children in such circumstances.

The majority's contrary holding relies almost exclusively on the Fifth Circuit's opinion in *Sanchez*, but it is irreconcilable with *Sanchez*'s holding. It is true that the Fifth Circuit held that "the asylum finding that the children have a well-founded fear of persecution does not substitute for or control a finding under Article 13(b) of the Convention." 761 F.3d at 510. It is also true that asylum adjudications apply a different evidentiary burden than the Hague Convention. From these two statements, the majority extrapolates that a district court need not consider an asylum grant at all. This all-or-nothing dichotomy stretches *Sanchez* past its breaking point and is inconsistent with both the Hague Convention and the United States's asylum obligations. An asylum grant is not dispositive. It remains, however, "relevant to any analysis of whether the Article 13(b) . . . exception applies." *Sanchez*, 761 F.3d at 511. For this reason, the district

court must consider a grant of asylum when deciding whether to order the return of a child pursuant to the Hague Convention.

**C. Article 20**

Although Article 13(b) alone suffices to show why the district court was required to consider the asylum grant, there is a parallel reason found in Article 20. The Article 20 affirmative defense applies when "[t]he return of the child . . . would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20.[4]

It is true that Article 20 is for "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." 51 Fed. Reg. at 10,510. Consequently, the exception has been only rarely applied by U.S. Courts. *See Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 916 (N.D. Ill. 2015) ("[T]he Court was unable to find[] a single case where the court refused to return a child based on Article 20."); *Aly v. Aden*, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *19 (D. Minn. 2013) ("The Court has found no cases in which a United States court has applied this exception to prevent the return of a child."); *but see Galaviz v. Reyes*, No. EP-21-00286-FM, 2022 WL 620702 (W.D. Tex. Feb. 22, 2022) (holding that Article 20 applied because the child would be unable to attend school if returned to Mexico because the school was unable to accommodate his special needs).

Nevertheless, asylum protections derive from "fundamental principles . . . relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20. The 1951 Convention Relating to the Status of Refugees ("1951 Convention") provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his [protected status]." 1951 Convention, art. 33, ¶ 1;[5] *see also* Universal Declaration of Human Rights, art. 14 (1948)

---

[4]Salame's assertion that Tescari failed to Raise Article 20 issues before the trial court is incorrect. *See* R. 34 (Trial Br. at 5–6) (Page ID #614–15).

[5]The United States acceded to this provision in the 1951 Protocol because it was adopted by the 1967 United Nations Protocol Relating to the Status of Refugees, to which the United States was a party. *See* 19 U.S.T. 6225, T.I.A.S. No. 6577 (1968).

("Everyone has the right to seek and to enjoy in other countries asylum from persecution."). The 1951 Convention's use of the phrase "in any manner whatsoever" demonstrates that this principle is intended to reach broadly: it is incompatible with that language to look for loopholes through which refugees can be removed.

Consistent with its international human rights obligations, Congress has enacted laws that protect refugees against being returned to the country from which they fled. Federal asylum laws prohibit the executive branch from removing such persons. *See* 8 U.S.C. § 1158(c)(1) ("[T]he Attorney General . . . shall not remove or return the alien to the alien's country of nationality."). I do not disagree with the majority that this provision directly applies to only the executive branch and not the judiciary. But ordering the return of children, when our country's asylum laws would prohibit the executive from enforcing such an order, cannot be consistent with the protection of human rights and fundamental freedoms. Such a return goes against the broad principles espoused by both domestic and international law.

Although no U.S. court has squarely answered whether the Article 20 exception applies in a situation in which a parent or child was granted asylum, the Ontario Court of Appeals in *A.M.R.I.*, [2011] O.N.C.A. 417 ¶ 71, held that the Article 20 exception applies to cases involving refugee children. It explained that "[u]nder both [Canadian law] and its international human rights obligations, Canada is prohibited from engaging in the refoulment of Convention refugees, including refugee children." *Id.* Additionally, the Fifth Circuit in *Sanchez*, 761 F.3d at 511, explained that the asylum grants "are relevant to any analysis of whether the Article 13(b) or 20 exception applies." Returning an individual who has been granted asylum to their country of nationality violates basic human rights principles and shocks the conscience.

Finally, recognizing that a situation in which individuals have been granted asylum falls within the Article 20 exception does not conflict with the purposes of the Hague Convention. First, "the Hague Convention is generally intended to . . . deter parents from crossing borders in search of a more sympathetic court." *Friedrich*, 78 F.3d at 1064. This principle does not come into play when a parent has a well-founded fear of persecution in their home country. In such cases, parents are not crossing borders to forum shop; they are crossing the borders to avoid persecution. Second, "[t]he Convention is based on the principle that the best interests of the

child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 16. However, requiring the return of a child to a country that is unable to adjudicate custody disputes "would defeat the Convention's object and purpose, because custody could not be adjudicated at all." *Pliego*, 843 F.3d at 233. Because an individual who has been granted asylum is likely unable to fully access the courts in the country from which they have fled persecution, refusing return in such cases does not conflict with the Hague Convention.

Tescari, who was a member of the political party that opposes the Maduro regime, was granted asylum in the United States. R. 69-9 (Asylum Docs.) (Page ID #1112–13); R. 99 (Tr. at 154) (Page ID #2449). The children were granted asylum as well. R. 69-9 (Asylum Docs.) (Page ID #1114–17). Yet, the district court's opinion did not discuss whether the asylum grants implicate the Hague Convention's affirmative defenses. Because the district court abused its discretion in failing to consider the asylum grants, I would remand this case for further proceedings. I respectfully dissent.